**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **BUCKS COUNTY ONCOPLASTIC** | ) | **Case No. 3:09-bk-03570** |
| **INSTITUTE, LLC** | ) | **Chapter 7** |
| | ) | **Judge Harrison** |
| **Debtor.** | ) | |

---

**THE DEADLINE FOR FILING A TIMELY RESPONSE IS:  December 10, 2021**

**IF A RESPONSE IS TIMELY FILED, THE HEARING WILL BE HELD ON December 28, 2021 at 9:00 A.M. in Courtroom Three, 701 Broadway, Nashville, Tennessee 37203 or, if so directed by the Court, by Zoom telephonic conference; toll-free call-in number: 833-568-8864; Meeting ID: 160 2983 9352**

---

**OBJECTION OF PIONEER FUNDING GROUP, LLC TO PROOF OF CLAIM 53**
**FILED BY MPT OF BUCKS COUNTY, L.P.**

---

In accordance with 11 U.S.C. § 502 and Federal Rule of Bankruptcy Procedure 3007, Pioneer Funding Group, LLC (the "**Objector**") hereby objects (the "**Objection**") to the proof of claim filed against Bucks County Oncoplastic Institute, LLC (the "**Debtor**") by MPT of Bucks County, L.P. ("**MPT**"), designated Proof of Claim 53 (the "**MPT Proof of Claim**"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     The MPT Proof of Claim is based on the Lease[1] and should be disallowed for a simple reason: MPT released all of its claims against the Debtor in a postpetition settlement agreement.

---

[1] All capitalized, undefined terms shall have the meanings ascribed below.

2.     The material facts are not in dispute. MPT was the landlord of Debtor, which owned the Debtor's hospital facility. The Debtor's indirect parent company, DSI Holding Company, Inc. ("**DSI Parent**"), provided a limited guarantee of the Debtor's lease obligations. The Debtor later defaulted and filed the instant bankruptcy case, prompting MPT to sue DSI Renal Holdings LLC ("**DSI Renal**") (as successor of DSI Parent by merger) for payment on the Lease guarantee. Thereafter, MPT prevailed in the litigation and won a $3.8 million judgment. MPT executed a Settlement Agreement under which it released all claims against DSI Renal ***and its affiliates***, ***including the Debtor***, and voluntarily dismissed its state court action, in exchange for $1.4 million in full and final satisfaction of the judgment.

3.     Despite waiving all claims in the Settlement Agreement against DSI Renal and its affiliates, including the Debtor, MPT now seeks to rewrite history, acting as if the release in the Settlement Agreement simply does not exist.  Quite to the contrary, however, the release is clear, unequivocal, and binding.  And it bars MPT from seeking to collect anew on any claim in this case, including the MPT Proof of Claim.

4.     This Court should disallow the meritless and fully waived MPT Proof of Claim, especially given the extraordinary and outsized impact this claim will have on the overall distribution to unsecured creditors who maintain valid claims against the Debtor.  Accordingly, Objector respectfully requests that this Court expunge the MPT Proof of Claim in its entirety.

5.     If, however, the Court does not interpret the Settlement Agreement to waive MPT's ability to collect on a claim in this case, the MPT Proof of Claim should nevertheless be substantially reduced.  MPT seeks duplicative damages which grossly inflate the size of the claim. Further, and more problematically, MPT fails to inform this Court of various actions it has taken to substantially mitigate its damages.  Because MPT successfully re-leased the premises and then

2

sold the Property within a matter of years, MPT's actual damages in this case are *de minimis*, if they exist at all.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).

## THE PARTIES

7.     The Objector is a creditor of the Debtor. As such, it is a "party in interest" under section 502(a) of the Bankruptcy Code with standing to object to the MPT Proof of Claim. *E.g., In re Mechanicsburg Fitness, Inc.,* 592 B.R. 798, 808 (Bankr. M.D. Pa. 2018) ("[S]ection 502(a) . . . confers an unfettered right upon chapter 7 creditors to object to the claims or interest of others."); *accord In re C.P. Hall Co.,* 513 B.R. 540, 543-44 (Bankr. N.D. Ill. 2014) ("The right to object to claims that section 502(a) grants creditors [in a chapter 7 case] is unqualified."); *see also In re Weinstein Co. Holdings, LLC,* 595 B.R. 455, 463 (Bankr. D. Del. 2018) (section 502(a) permits one creditor to object to claim of another creditor).

8.     MPT is an affiliate of Medical Properties Trust, Inc., a publicly-traded REIT based in Birmingham, Alabama, with a market capitalization of over $12.6 billion.[2] It filed proof of claim number 53 against the Debtor, in the amended amount of $29.9 million, which is the subject of this Objection.

## BACKGROUND

### I.     MPT's Relationship with the Debtor and Lawsuit Against DSI Parent.

9.     Before January 2010, DSI Parent was the ultimate owner of two separate healthcare-related businesses. One of them was an entity called DSI Hospitals, Inc., which was

---

[2] Bloomberg (as of November 3, 2021). https://www.bloomberg.com/quote/MPW:US.

the intermediate holding company of the Debtor, a subsidiary that operated a breast cancer treatment hospital in Bensalem, Pennsylvania.

10.     Discussions between MPT and the Debtor began in 2006.  The concept was for MPT to fund the cost of the hospital facility (expected to total roughly $38 million) and earn back a healthy return on their investment of over 10% per annum through escalating lease payments over 15 years.  From the outset of the transactions, MPT took steps to limit their liability, including securing a substantial guarantee of over one year's rent from the Debtor's parent as well as a multimillion-dollar letter of credit also equating to approximately one year's rent.

11.     MPT and the Debtor were parties to a lease agreement, under which the Debtor leased from MPT the hospital it operated and the land on which the facility was located (the "**Lease**").  A true and correct copy of the Lease is attached hereto as **Exhibit A**. MPT had originally obtained a guaranty of up to $6.3 million from DSI Parent's equity sponsor, founder, and related entities and individuals, which it later released and entered into a new guaranty, under which DSI Parent was the sole guarantor of up to $5 million of the Debtor's Lease obligations. *Id.* at 70-88.

12.     Section 3.1 of the Lease establishes the Debtor's rent obligations.  The rent structure is such that there is a "Base Rent" that is calculated as 10.75% of the Total Development Costs. "Total Development Costs" are defined in the Lease as:

> The (i) Initial Purchase Price, plus any additional purchase price amounts paid for the Leased Property by Lessor or its Affiliates pursuant to the Purchase Agreement, plus all reasonable costs and expenses not included in the Initial Purchase Price incurred or paid in connection with the purchase and lease of the Leased Property, **including, but not limited to, legal, appraisal, title, survey, environmental, seismic, engineering and other fees and expenses paid in connection with the inspection of the Leased Property and site visits, and fees paid to advisors and brokers, except to the extent such items are paid by Lessee**, (ii) costs of Capital Additions financed by Lessor (and Lessor's Affiliates) as provided in Section 10.3 of this Lease, (iii) all amounts advanced or paid pursuant to the Development

4

Agreement and the Funding Agreement, (iii) Construction Period Rent, as provided in Section 3.1(a); (iv) interest on advances made by Lessor prior to the date hereof in the amount of Ninety-Seven Thousand, One Hundred Sixty and 12/100 Dollars ($97,160.12) which shall be deemed incurred as of the date hereof; (v) any amounts paid by Lessor in connection with the posting of a development bond required by the township of Bensalem, Pennsylvania (it being understood that Total Development Costs and the Base Rent shall be adjusted accordingly for any amounts returned to Lessor with respect to such bond) and (vi) **all fees and expenses paid or advanced by Lessor and its Affiliates in connection with the construction and development of the Leased Property, except to the extent such items are paid by Lessee.** Notwithstanding the foregoing, Total Development Costs shall not include any Additional Charges.

Lease § 3.1(b).

13.     In addition to the Base Rent, the Lease includes "Construction Period Rent," which amounts to deferred rent during the Construction Period that is "deferred and added to Total Development Costs but will not be paid until the Completion Date at which time the Construction Period Rent amount will be amortized and paid over the Fixed Term beginning with the Completion Date, in equal monthly installments as part of the payments of Base Rent." *Id.* § 3.1(a). Finally, the rent obligations include "Percentage Rent," which equals 1.75% of revenues of the hospital for the preceding month.

14.     In sum, the Lease's rent obligations have the construction and development costs for the operation "baked into" them. The Debtor and MPT contractually agreed that rent would cover all of these expenses, including appraisal costs, attorneys' fees associated with the development, and all other fees or expenses associated with the Construction.

15.     The Debtor's hospital facility opened in 2007, but was apparently not profitable. As a result of its apparent chronic liquidity issues, the facility closed in February 2009, and the Debtor filed this chapter 7 bankruptcy on March 30 of that year. *See* Petition [ECF No. 1]. The Debtor breached the Lease and MPT unilaterally terminated the Lease prior to the Debtor's petition

date.  The MPT Proof of Claim is based on the alleged amount owed as a result of this contract termination.

## II.     MPT Mitigated Its Damages.

16.     After the Debtor breached the Lease, MPT took steps to mitigate its damages.

17.     Specifically, MPT provided notice of termination to the Debtor and terminated the Lease in January 2009.  *See* MPT Form 10-K from 2008, a true and correct copy of which is attached hereto as **Exhibit B**, at 27 ("In late January 2009, the current operator of our Bucks County facility gave notice of their intentions to close the facility. The lease was terminated on January 30, 2009 and operations at the Bucks County facility have ceased.")  The Debtor vacated the premises and filed this case.  *Id.*

18.     At the time of the termination, rent was $410,812.42 per month, equating to just under $5 million per year.  *See* MPT Proof of Claim at 176.

19.     MPT re-leased the hospital facility in July of 2009 for rent of roughly $2 million per year plus up to $1 million per year in profits participation.  *See* MPT Form 10-K from 2009, a true and correct copy of which is attached hereto as **Exhibit C**, at 52-53 ("In July 2009, we re-leased our Bucks County facility located in Bensalem, Pennsylvania. The lease has a fixed term of five years with an option, at the lessee's discretion, to extend 15 additional periods of one year each. No rent is required for the first six months. Thereafter, rent will be $2.0 million per year with annual escalations of 2%. Separately, we also obtained a profits interest whereby we may receive up to an additional $1.0 million annually pursuant to an agreement that provides for our participation in certain cash flows, if any, as defined in the agreement. After the fixed term, the tenant has the right to purchase the facility at a price based on a formula set forth in the lease agreement.").

6

20.     The new tenant then purchased the property for $35 million in August 2014. *Id.* ¶ 10. *See* MPT Form 10-K from 2014, a true and correct copy of which is attached hereto as **Exhibit D**, at 87 ("On May 20, 2014, the tenant of our Bucks facility gave notice of their intent to exercise the lease's purchase option. Pursuant to this purchase option, the tenant acquired the facility on August 6, 2014 for $35 million. We wrote down this facility to fair market value less cost to sell, resulting in a $3.1 million real estate impairment charge in the 2014 second quarter.").

21.     Further, as discussed more fully *infra*, MPT obtained a judgment against guarantors of the Lease in the amount of $3.8 million. *See* Order of Judgment dated September 13, 2010 attached hereto as **Exhibit E**. MPT received payment of $1.4 million in full satisfaction of this judgment. *See* Settlement Agreement (defined below), a true and correct copy of which is attached hereto as **Exhibit F** at § 1.1.

22.     MPT also had a letter of credit securing the Debtor's Lease obligations in the amount of $3,977,500.00 that it, in all likelihood, drew down upon when the Debtor defaulted on the Lease. *See* Lease § 41.7.

23.     Finally, MPT received a $1.2 million "operating expense contribution" from DSI Parent which bought down the parent guarantee from $5 million to $3.8 million. *See* Letter dated January 30, 2009 from MPT to DSI Holding Company, Inc., a true and correct copy of which is attached hereto as **Exhibit G**, at 3 ("The Lease Guaranty Obligation is subject to a maximum of Five Million Dollars ($5,000,000.00) which was reduced to Three Million Eight Hundred Thousand Dollars ($3,800,000.00) as a result of DSI's "Operating Expense Contribution" pursuant to the terms of that certain Funding Agreement dated as of November 12, 2008.").

7

### III. The Settlement Agreement.

24.     On November 19, 2009, MPT commenced an action in Delaware state court against DSI Parent and others seeking to enforce both the old and new guarantees, Case No. N09C-11-160-CLS in the Superior Court of the State of Delaware (the "**Guaranty Case**"). It goes without saying that the Guaranty Case was brought because of the Debtor's breach of the Lease.

25.     In September 2010, the Delaware state court in the Guaranty Case granted MPT partial summary judgment on its claim against the Debtor (as successor of DSI Parent), in the amount of $3,800,000, plus pre-judgment interest. Shortly afterward, the parties, represented by counsel, began arms' length settlement negotiations.

26.     As a result of these negotiations, the parties executed that certain Settlement Agreement dated January 28, 2011 by and among MPT on the one hand and DSI Development, LLC, DSI Renal Holdings, LLC, as successor-in-interest to DSI Holding Company, Inc., Centre Bregal Partners, L.P., Jerome S. Tannenbaum, and Stephen Harrison on the other hand (the "**Settlement Agreement**") resolving the Guaranty Case.

27.     The Settlement Agreement includes a broad and comprehensive release of the defendants in the MPT lawsuit, including DSI Renal and each of its affiliates, unequivocally including the Debtor:

> 3.1     <u>Release by MPT</u>. Subject to MPT's receipt of the Settlement Amount and the releases described in sections 3.2-3.7 hereof, MPT, on its own behalf and on behalf of each of its agents, servants, officers, directors, employees, attorneys, parent companies, subsidiaries, affiliates, heirs, executors, successors and assigns (the "MPT Releasors"), does hereby fully, forever, irrevocably and unconditionally, **release, remise and discharge each of the Defendants, and each of the Defendants'** agents, servants, officers, directors, shareholders, members, employees, attorneys, **parent companies, subsidiaries, affiliates**, heirs, executors, successors and assigns (collectively, the "Defendant Released Parties"), CDSI I Holding Company, Inc. and its respective subsidiaries and affiliates ("CDSI") and Centre Partners Management LLC and its respective subsidiaries and affiliates ("CPM") **from any and all manner of claims**, charges, complaints, demands,

8

actions, causes of action, suits, rights, **debts**, dues, sums of money, costs, **losses**, accounts, reckonings, covenants, **contracts**, controversies, **agreements**, **promises**, **leases**, doings, omissions, damages, executions, **obligations**, liabilities and expenses (including attorney's fees and costs), **of every kind and nature whatsoever**, known or unknown, either at law or in equity, from the beginning of the world to this date, arising under any provisions of law of the United States, the State of Delaware, the Commonwealth of Pennsylvania, or any other state, and any claims at common law including contract or tort law, that the MPT Releasors ever had, now has, or can, shall or may have as of the date of this Agreement against the Defendant Released Parties, CDSI and CPM including but not limited to, by reason of, on account of, or arising out of, related to, and/or in connection with any of the facts alleged and/or the claims asserted in the Lawsuit; provided, however, that the foregoing shall not extend to, nor be construed as relating in any way to, MPT's rights under this Agreement. The parties acknowledge and agree that the foregoing is intended to be a "General Release", as such term is generally understood in the law.

Settlement Agreement § 3.1 (emphasis added).

28.     MPT received $1.4 million under the Settlement Agreement, and on February 9, 2011, filed a Satisfaction of Judgment with the Delaware state court and dismissed its lawsuit with prejudice. *See generally* Settlement Agreement.

**IV.     The MPT Proof Of Claim.**

29.     MPT first filed the MPT Proof of Claim on August 10, 2009 (the "**August 2009 Claim**"). *See* [Claim No. 53-1]. The August 2009 Claim was for an "unknown" amount, despite the fact that MPT was perfectly capable of calculating its theory of damages under 11 U.S.C. § 502(b)(6) at that time. The August 2009 Claim in an "unknown" amount remained unaltered throughout the life of this original bankruptcy case until the Trustee Final Report in 2011 necessitated liquidating all claims so that distributions could be divided pro-rata among creditors holding valid and allowed unsecured claims. Claims reconciliation was performed.[3] By far the largest claim in the case, representing over 90% of the unsecured claims pool, is Claim 49 which

---

[3] The United States Trustee's Handbook states "The trustee may not submit the final report (TFR) for a case prior to completion of the claims examination and determination process."

is held by Objector. Chapter 7 Trustee Eva Lemeh (the "**Trustee**") filed a Final Report and Application for Compensation, as amended, on December 22, 2011. *See* [ECF No. 170] (the "**TFR**"). The TFR allowed MPT's claim at $0.00 and provided for distributions to creditors holding valid and allowed unsecured claims. *Id.* MPT did not object to its treatment in the TFR, did not receive any payment on its claim, and therefore did not dilute distributions to the valid and allowed unsecured creditors. *Id.*. The Trustee's Final Account and Distribution Report [ECF No. 181] confirmed that the August 2009 Claim was allowed at $0.

30. Of note, the Settlement Agreement resolving the Guaranty Case was executed in February of 2011, nine months prior to the TFR. As of December 2011, it appears as if both the Trustee and MPT did not view the August 2009 Claim as legitimate or valid in this bankruptcy case, as the amount of the claim was calculable and MPT never sought to amend its claim prior to the approval of the TFR or the distributions thereunder.

31. Indeed, MPT did not amend its claim until July 10, 2013, after it was invited to do so by the Trustee so that the Debtor would have a higher claim in the related DSI Renal bankruptcy case, Case No. 11-11722-KBO in the District of Delaware (the "**Delaware Bankruptcy**"). The Trustee's position in the Delaware Bankruptcy was that DSI Renal was obligated to pay all claims of the Debtor, so a larger claim base in this case would mean a larger claim in the Delaware Bankruptcy. *See* [Delaware Bankruptcy Claim 16-2]. Upon information and belief, the Trustee in the Delaware Bankruptcy invited and encouraged the Trustee to file a large claim in the Delaware Bankruptcy in order to substantiate and bolster the merits of his litigation in the Delaware Adversary Proceeding.

32. On July 10, 2013, MPT amended its claim to an astounding $75,504,228.50, almost double the cost of the new hospital facility. This amount appears to be for the entire amount of

Case 3:09-bk-03570   Doc 309   Filed 11/10/21   Entered 11/10/21 13:07:12   Desc Main
Document     Page 10 of 34

rent that could have been collected under the Lease, without taking into account any mitigation factors or limitations based on section 502(b)(6) of Title 11 of the U.S. Code (the "**Bankruptcy Code**").  Upon information and belief, the astronomical size of this claim was attributable, in part, to the Trustee's desire to have the largest possible claim in Delaware.

33.    At the same time that MPT filed its amended claim in this case, it also filed a proof of claim for $10,400,787.98 in the Delaware Bankruptcy on May 31, 2013 (the "**Delaware 2013 Claim**"). *See* [Claim 15-1 in Delaware Bankruptcy].  MPT clearly stated in the Delaware 2013 Claim that its total damages, uncapped by any guarantees or releases of any kind, were no more than $10.4 million.  This dollar figure seems to approximate what MPT deducted against income for tax purposes in its audited, publicly filed financial statements of $4.7 million and $2.4 million in 2008 and 2009, respectively, as a result of the Debtor's breach.  MPT reduced the 2009 write off by the amount of the $1.4 million settlement payment.

34.    Though Objector believes the $10.4 million figure is overstated because (1) Construction Period Rent should be amortized and should not be due and payable immediately, and (2) there are several unapplied credits which would significantly reduce the balance, for the sake of argument and assuming this figure was correct, MPT viewed its damages for breach of the Lease as only $10.4 million at the time it filed the Delaware 2013 Claim.

35.    The Delaware Bankruptcy ran its course, which primarily consisted of the adjudication and settlement of the adversary proceeding in or around April 2021. The settlement of this adversary proceeding allowed for $52.5 million to flow into the Delaware Bankruptcy estate and, accordingly, provided for a substantial payment on the Debtor's claim—which in turn would result in another round of disbursements to unsecured creditors in this case.

36. Discovery has uncovered that the Trustee was concerned with certain priority issues with respect to its claim in the Delaware Bankruptcy. Particularly, the Trustee was concerned that the Delaware 2013 Claim filed by MPT could substantially impair the Debtor's claim in the Delaware case. *See* Email dated April 9, 2021 from Phillip Young to Lawrence G. McMichael, a true and correct copy of which is attached hereto as **Exhibit H**. The Trustee's concerns about priority appear misplaced, however, because the Delaware 2013 Claim contained a multitude of infirmities. First, it was tardily filed on May 31, 2013, nearly two years after the bar date of October 26, 2011. This means, at best, it would be subordinated to timely filed unsecured claims and pari passu with the Debtor's late filed claim. Second, MPT did not appear as a creditor or anywhere else in the schedule of assets and liabilities filed on June 3, 2011 [Dkt. No 5].[4] Third, the Delaware 2013 Claim was conclusively waived per the Settlement Agreement as described herein. In spite of these facts, the Trustee struck a deal with MPT whereby MPT would withdraw the hopelessly unsupportable Delaware 2013 Claim in exchange for an overinflated, allowed claim in this bankruptcy case. *See* Email Dated July 16, 2021 from Phillip Young to Patton W. Hahn, a true and correct copy of which is attached hereto as **Exhibit J**. MPT submitted a copy of its proposed MPT Proof of Claim to the Trustee, who accepted it as-is and effectively told MPT that its claim would be approved in Tennessee if it removed its claim in Delaware. *Id.* The Trustee made this deal despite the fact that she was fully aware of the Settlement Agreement and, thus, the waiver issues associated therewith.[5] Based on this deal, MPT withdrew its claim in the Delaware

---

[4] A true and correct copy of the Schedules is attached hereto as **Exhibit I**.

[5] *See* Timeline of Facts drafted by Phillip Young, a true and correct copy of which is attached hereto as **Exhibit K**, at 14 (discussing Trustee's negotiations with MPT, noting that "Mr. Young felt certain that the Delaware Trustee would object to MPT's claims because MPT had entered into a settlement agreement with DSI Parent concerning DSI Parent's liability on MPT's rent. Moreover, it was probable that Trustee Lemeh, as a creditor of DSI Parent, would also file an objection to MPT's Delaware Bankruptcy claims and then, in turn, to its Tennessee claims on the grounds that they were duplicative of the Delaware Bankruptcy claims.")

Case 3:09-bk-03570    Doc 309    Filed 11/10/21    Entered 11/10/21 13:07:12    Desc Main
Document      Page 12 of 34

Bankruptcy and now seeks approval of the MPT Proof of Claim in this case with little-to-no resistance from the Trustee.[6] *Id.* Creditors of this estate stand to be diluted by over 72% by the inclusion of a grossly inflated claim and receive nothing in return. The Delaware 2013 Claim could not overcome its infirmities and certainly would have been expunged by the Delaware Trustee, it was just a matter of time.

37. On August 13, 2021, MPT amended the MPT Proof of Claim to the current amount of $29,991,934.23. The MPT Proof of Claim completely ignores the existence of the Settlement Agreement. MPT also failed to provide any information about its substantial mitigation efforts and moneys already received, including the $1.4 million judgement, as detailed above.

**OBJECTION**

**I.      MPT Expressly Released All Claims Against the Debtor.**

38. Section 502(b) of the Bankruptcy Code provides that the Court shall allow claims except to the extent "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). MPT's lease claim against the Debtor is unenforceable because it has been released.

39. As noted above, MPT agreed in the Settlement Agreement to a release that includes all DSI affiliates, such as the Debtor, "from any and all manner of claims . . . known or unknown . . . that [MPT or its affiliates] ever had, now has, or can, shall or may have as of the date of this Agreement, including but not limited to . . . debts, . . . losses, . . . contracts, . . . agreements,

---

[6] On or about September 13, 2021, Objector sent counsel for the Trustee a memorandum detailing the issues regarding MPT's waiver of its claim and further detailing how the claim appears to be overstated. Despite receiving this information, the Trustee has made clear that she has no intention of objecting to the MPT Proof of Claim. *See* Email Correspondence with Counsel for the Trustee, attached hereto as **Exhibit L**. Shockingly, however, the Trustee has objected to the Objector's stipulated and allowed proof of claim—a claim that the Trustee previously agreed was valid through an Agreed Order—drafted by the Trustee—almost exactly ten (10) years ago.

13

promises, leases, . . . [and claims] arising out of, related to and/or in connection with any of the facts alleged and/or the claims asserted in the Lawsuit." Settlement Agreement § 3.1. The release was granted "fully, forever, irrevocably, [and] unconditionally." *Id*.

40.     The Guaranty Case was prosecuted in Delaware by MPT against the various guarantors of the Lease based on Debtor's alleged breach of the Lease. It is this Lease that constitutes the basis for the MPT Proof of Claim in this case. By the clear language of the general release in the Settlement Agreement, MPT released the Debtor, as an affiliate of the Guaranty Case defendants, from all debts, contracts, agreements, promises, leases, and obligations of every kind and nature whatsoever.

41.     To the extent MPT intends to argue that the Debtor was not an intended beneficiary of the Settlement Agreement or otherwise does not fall within the Settlement Agreement's definition of "Defendant Released Parties," such argument would strain credulity. As an initial matter, the Guaranty Case was being prosecuted based on the guaranties of the very Lease that underpins the MPT Proof of Claim. MPT was acutely aware at the time of its execution of the Settlement Agreement in 2011 that the Debtor was both in default on the Lease and in bankruptcy.[7] There is no doubt that MPT understood the Debtor to be an affiliate of the parties to the Settlement Agreement at the time of its execution. An unaffiliated party would certainly not provide a multimillion-dollar guarantee to the Debtor. The Debtor was also listed as a co-debtor on the Delaware Case's schedule of assets and liabilities. *See* **Ex. I**.

42.     Further, there is no question that the general release applies to the Debtor, as an affiliate of the Defendant Released Parties. Bankruptcy Code section 101(2) defines the term "affiliate" to include a "corporation 20 percent or more of whose outstanding voting securities are

---

[7] MPT filed a notice of appearance in this case on April 8, 2009. *See* [ECF No. 9].

directly owned, controlled, or held with power to vote, by the debtor, **or by an entity that directly or indirectly owns, controls,** or controls the power to vote, 20 percent or more of the outstanding voting securities of the debtor. . . ." 11 U.S.C. § 101(2)(B) (emphasis added). Under Delaware law,[8] an affiliate is defined as "a person that directly, or indirectly through 1 or more intermediaries, controls, or is controlled by, or is under common control with, another person." Del. Code Ann. tit. 8, § 203. Here, both the Debtor and defendant DSI Renal were ultimately owned and controlled by DSI Holding Company, Inc. As such, the Debtor constitutes an "affiliate" of DSI Renal, and, thus, falls within the general release in the Settlement Agreement.[9]

43.     Because the MPT Proof of Claim is based on claims and damages arising directly from the Lease, the MPT Proof of Claim is invalid inasmuch as such claims and damages were expressly released. Section 502(b) of the Bankruptcy Code provides that a court shall allow claims except to the extent "such claim is unenforceable against the debtor and property of the debtor,

---

[8] The Settlement Agreement is controlled by Delaware law. Settlement Agreement § 4.4.

[9] To be sure, the fact that the Debtor was not expressly named in the Settlement Agreement or formally a party thereto is of no consequence—it still may claim the benefits of the release in the agreement. It is well recognized that a general release in a settlement agreement may release non-parties to an agreement from liability in situations where the non-party is designated within a general class of intended beneficiaries. *See, e.g., American Nat'l Trust Co. of Chicago v. Kentucky Fried Chicken of Southern California, Inc.*, 308 Ill.App.3d 106 (Ill. 1999) (holding that the lessor of commercial real estate could not seek damages from a prior assignee, where the lessor had executed a settlement agreement that contained a general release of the then-current tenant entity and all of its predecessors-in-interest: "Since [prior assignee] belongs to one of the designated classes of intended beneficiaries [i.e., predecessor in interest], it is entitled to enforce the release of claims.") (citing *Garcia v. Lovellette*, 265 Ill.App.3d 724, 732, 203 Ill.Dec. 376, 639 N.E.2d 935 (1994) (holding it is unnecessary that a contract for the benefit of a third-party beneficiary identify him by name; the contract may define the party benefitted by class description); *Key v. Exxon Mobil Corp.*, 508 F. Supp. 3d 1072 (E.D. Okla. 2020) (holding that parent companies of oil and gas well operator were "released parties" within meaning of settlement agreement which precluded claims against parent companies even though parent companies were not expressly named in definition of term "released parties" inasmuch as definition of "released parties" was expansive, including operator, its predecessors, and entities that were enumerated "without limitation," and with respect to leases at issue, parent companies were operator's "predecessors," in that they previously held interests and responsibilities under leases before such interests were transferred to operator); *Air–Sea Forwarders, Inc. v. United States*, 39 Fed.Cl. 434 (Fed.Cl.1997) (release stating, "The releases in this Agreement shall extend to and inure to the benefit of each released party and each of their past and present ... alter egos ..." held to release CIA as alter ego of named settling party even though CIA was not a named party to release).

under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). The MPT Proof of Claim is unenforceable, as it has been released by the Settlement Agreement. Courts routinely disallow proofs of claim where the contractual underpinning for the claim has been released or waived. *See, e.g., Ruiz v. Kennedy (In re Kennedy)*, 566 B.R. 690, 732-33 (Bankr. D.N.J. 2017) (disallowing claims because creditor released them as a part of a settlement agreement); *In re New Century TRS Holdings, Inc.,* 2013 WL 5460029, at *2 (Bankr. D. Del. Sept. 30, 2013) (creditors' claims disallowed because they were settled and paid and no injury could be addressed in the bankruptcy case); *Bartel v. Bar Harbor Airways, Inc.,* 196 B.R. 268, 271 (S.D.N.Y. 1996) (upholding bankruptcy court's disallowance of creditor's claim on the grounds that appellant had already settled claim with the debtor).

44. Indeed, it is clear that MPT viewed its claim against the Debtor as waived vis-à-vis its inaction previously in this case. Prior to this case originally closing, the Trustee issued the TFR in October 2011 that detailed all claims in full and the amounts that would be distributed to each creditor. Despite the fact that MPT's theory of damages could have been calculated at that time, as the breach of the Lease had occurred pre-petition, MPT sat silent and allowed for its claim to be liquidated at $0.00, with no distribution, following the Trustee's claims reconciliation process. This inaction can be attributed to one of two reasons: (1) negligence, which Objector does not believe is the case, or (2) MPT's understanding that it had released any and all claims via the Settlement Agreement—which it had executed only nine (9) months prior to the TFR. It was only when the possibility for a greater distribution came along through the Delaware Bankruptcy that MPT re-appeared, seeking to raise its long-released and adjudicated claim from the dead.

16

45.     Put simply, the MPT Proof of Claim is invalid, unenforceable, and should be disallowed in its entirety.

## II.     The MPT Proof of Claim is Barred Under *Res Judicata*, Collateral Estoppel, the Bankruptcy Code and the Bankruptcy Rules.

46.     In addition to being invalid as a result of the release contained in the Settlement Agreement, the MPT Proof of Claim is also barred as a result of *res judicata*, collateral estoppel, the Bankruptcy Code and the Bankruptcy Rules.

47.     On August 10, 2009, the day of the initial bar date, MPT filed the August 2009 Claim in an unliquidated amount. At the time that the TFR was filed in 2011, the August 2009 Claim was allowed at a value of $0. Allowed claims of approximately $11.7 million were paid a small *pro rata* distribution per the TFR. MPT did not object to the treatment of its claim in the TFR and, as a result, did not receive a distribution on account of its claim. Thereafter, a Final Decree was issued in July 2012 and the case was closed. On February 7, 2013, the case was reopened, after counsel for the chapter 7 trustee in the Delaware Bankruptcy informed the Trustee of litigation that could bring money into the Delaware Bankruptcy for the benefit of DSI creditors, including the Debtor, if the Trustee filed a claim in the Delaware Bankruptcy. On July 10, 2013, five months after reopening this case, MPT filed a purported amendment of its August 2009 Claim in the amount of $75.5 million (the "**July 2013 Claim**"). This claim was only three pages long and included no supporting documentation or information on how the dollar amount of the claim was calculated. The lack of supporting documentation or mathematical calculations is astounding, because in the intervening years, MPT had litigated the parent guarantee, won a Delaware state court judgment and accepted $1.4 million in full and final satisfaction *with prejudice*.

48.     In February 2020, the Trustee reopened the claims bar date, extending it through May 15, 2020 "to allow any creditors who failed to file a claim against the Debtor, under the

mistaken belief that the debt was owed by DSI Holding Company, LLC, to timely file a claim." (the "**Extended Bar Date**").  MPT ignored the Extended Bar Date.  On August 13, 2021, fifteen (15) months after the expiry of the Extended Bar Date, MPT filed another purported amendment to its claim in the amount of $29,991,934.23.

49.    MPT's attempt to change the allowed amount of its claim, first from $0 to $75.5 million and then to $29.9 million, is barred under principles of *res judicata* and collateral estoppel inasmuch as the August 2009 Claim was allowed at $0 and a distribution to all other creditors in the case took place pursuant to a final order of this Court.  *See*, *e.g.*, *In re: AYERS BATH (U.S.A.), CO., LTD.*, No. 2:13-BK-17409-RK, 2021 WL 4317321, at *28 (Bankr. C.D. Cal. Sept. 22, 2021) (holding that amount of proof of claim was set pursuant to chapter 7 trustee's final report and failure to object to proof of claim barred future actions on that claim pursuant to res judicata).  This is true even though there was not a prior order expressly allowing the claims in the amounts set forth.  *Id.* ("Foremost's proof of claim was deemed allowed when the Chapter 7 trustee filed his final report and account of administration of the estate on April 14, 2015. Although there was no specific order allowing Foremost's unobjected-to claim, its allowed proof of claim was a final judgment for res judicata purposes."); *Trustees of Operating Engineers Loc. 324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 383 (6th Cir. 2019), *reh'g denied* (June 20, 2019) ("[W]e hold that an uncontested proof of claim that is allowed pursuant to 11 U.S.C. § 502(a) is a final judgment on the merits for the purposes of res judicata, with or without a separate court order specifically allowing the claim."); *see also In re McLaren*, 562 B.R. 309, 321–22 (Bankr. E.D. Va. 2016) (holding that failure to object to distribution of proceeds in chapter 7 trustee's final report barred later action to change distribution of funds from the estate).

18

50.     MPT's only avenue to attempt such a maneuver would have been by seeking relief under section 502(j), a **limited** exception to *res judicata* and collateral estoppel, which permits a court to reconsider an allowed claim for "cause." *See Colley v. Natl. Bank of Tex. (In re Colley)*, 814 F.2d 1008, 1010 (5th Cir.1987) ("The court's broad discretion [regarding section 502(j)] should not ... encourage parties to avoid the usual rules for finality of contested matters."). *Matter of Bernard*, 189 B.R. 1017, 1022 (Bankr. N.D. Ga. 1996) (noting that section 502(j) is a limited statutory exception to the doctrine of res judicata). And, at this point in the case—8 years after the filing of the first attempt to change the amount of its claim in 2013—MPT is precluded from seeking relief under section 502(j) as a result of it "sleeping" on its rights:

> The Court normally would agree that the pursuit of settlement options constitutes "cause" by which to justify a delay in requesting reconsideration of claims. As time drags on, however, even this noble interest ceases to offer a foundation upon which one may build a case for "cause." Thus, **somewhere during the many months which elapsed, the Debtor's continued failure to act has become both unreasonable and unjustifiable under the terms of section 502(j)**.

> Furthermore, the Court notes the degree to which the Debtor has exceeded the provisions of the Confirmation Order itself. As previously pointed out, that Order directed the Debtor to present all challenges to claims within the first six months following confirmation. **The Debtor's failure to observe that internal statute of limitations argues heavily against the presence of "cause" in this case**.

*Id.* at 1022-23 (emphasis added) (internal citations omitted); *see also In re Bancroft Cap Co.*, 182 B.R. 538, 540 (Bankr. E.D. Ark. 1995) (finding that failure to challenge a claim within the period specified in the debtor's plan foreclosed subsequent access to section 502(j); *In re Clark*, 172 B.R. 701, 704–05 (Bankr. S.D. Ga. 1994) ("The maxim "vigilantibus non dormientibus aequitas subvenit," or equity aids the vigilant, not those who slumber on their rights, has particular application in such a case. Debtor has failed to demonstrate that the equities of the case in favor of allowing reconsideration of [the creditor's] claim outweigh the necessity for finality in both the

claims allowance process and the rights of the parties as established by the confirmed plan. The Court will not exercise its discretion to reconsider [allowance of the claim]").[10]

51.     As a result, MPT's attempts in 2013 and 2021 to change the amount of the August 2009 Claim by way of purported amendments to the claim are improper and, thus, should be precluded.

52.     Moreover, to the extent the purported amendments to the MPT Proof of Claim constitute new proofs of claim, they are untimely under any calculation of the deadline for filing claims. Bankruptcy Code section 501(c) provides: "If a creditor does not timely file a proof of such creditor's claim, the debtor or the trustee may file a proof of such claim." 11 U.S.C. § 501(1)(c).   Bankruptcy Rules 3002(c) and 3004 dictate the time within which such claim must be filed by a trustee.  Rule 3004 provides:  "If a creditor does not timely file a proof of claim under Rule 3002(c) or 3003(c), the debtor or trustee may file a proof of the claim within 30 days after the expiration of the time for filing claims prescribed by Rule 3002(c) or 3003(c), whichever is applicable. The clerk shall forthwith give notice of the filing to the creditor, the debtor and the trustee." Fed. R. Bankr. P. 3004.  In turn, Bankruptcy Rule 3002(c) provides that "[i]n a voluntary chapter 7 case, chapter 12 case, or chapter 13 case, a proof of claim is timely filed if it is filed not later than 70 days after the order for relief under that chapter or the date of the order of conversion to a case under chapter 12 or 13. . . . "  Fed. R. Bankr. P. 3002(c).

53.     Here, the July 2013 Claim was filed 154 days after the case was reopened and is therefore untimely under Rule 3002. *See In re Chavis*, 47 F.3d 818, 824 (6th Cir. 1995) (affirming bankruptcy court decision disallowing proof of claim that was not filed within the time limits of

---

[10] Indeed, in the four (4) years between the original filing of the August 2009 Claim and the July 2013 Claim, MPT litigated the claim in a different forum, executed the Settlement Agreement releasing all claims against the Debtor and others, and accepted the settlement payment and dismissed the action **with prejudice**.

Rule 3002). Likewise, the MPT Proof of Claim was filed 15 months after expiration of the Extended Bar Date. As a result, each claim is untimely and, at most, should be subordinated to payment of all other allowed general unsecured claims pursuant to section 726(a)(3). *See In re Larry Merritt Co.*, 169 B.R. 141, 143 (E.D. Tenn. 1994) (holding that under section 726(a)(3) an untimely filed claim in a Chapter 7 case may be paid only if all other claims have been paid in full).

54. The Delaware 2013 Claim had previously been objected to in the Delaware bankruptcy proceeding by the Defendants in the Delaware Adversary Proceeding. In response, MPT filed 33 pages of briefing in two separate pleadings. The Defendants raised the settlement as a defense to the Delaware 2013 Claim and, unsurprisingly, MPT did not argue that the Debtor was not a party to the Settlement Agreement. In its response, MPT sidestepped any defense on the merits, instead focusing on which party had the ability to bring a claims objection. It appears clear that MPT has no viable response to the fact that it unequivocally waived its right to any claim in either the Delaware Case or this case, as Phillip Young correctly recognized. *See* **Ex. L** at 14. Otherwise, it surely would have addressed the waiver argument in the Delaware Case.

## III. To the Extent MPT Has Any Valid Clam, the Amount Asserted in the MPT Proof of Claim Is Greatly Overstated.

55. The MPT Proof of Claim asserts damages totaling $29,991,934.23, broken down as follows:

- Postpetition Rent:             $11,757,946.35 (502(b)(6) 15% of Lease Term)
- Prepetition Rent:              $8,246,543.42
- Prepetition Penalties:         $186,499.94
- Prepetition Costs:             $94,830.40
- Notes:                          $770,000.00
- Development Payments:       $4,057,883.00
- Construction Period Payments: $4,878,231.12

21

56.     These various claims make up two principal categories of its claim: (i) $18,233,987.88 in pre-petition damages (the "**Pre-petition Damages Claim Amount**") and; (ii) $11,757,946.35 in post-petition rejection damages under the Lease (the "**Rejection Damages Claim Amount**").  As discussed below, both of these amounts are greatly overstated and, in the event this Court determines that the MPT Proof of Claim is not waived or barred as discussed above, should be reduced.

**A.     The Pre-petition Damages Claim Amount is Overstated.**

57.     The portions of the Pre-petition Damages Claim Amount seeking recovery for "Development Payments" in the amount of $4,057,883.00 and "Construction Period Payments" in the amount of $4,878,231.12 are improper inasmuch as these amounts are already included within the amount of rent under the Lease which is set forth in the MPT Proof of Claim.  Additionally, the pre-petition rent calculation is unclear and requires additional scrutiny.

58.     Section 3.1 of the Lease establishes the rent obligations.  The rent structure is such that there is a "Base Rent" that is calculated as 10.75% of the Total Development Costs.  "Total Development Costs" are defined in the Lease to include all fees and expenses, including legal fees and appraisal costs, among other expenses, incurred in the development of the property.  In addition to the Base Rent, the Lease includes "Construction Period Rent," which amounts to deferred rent during the Construction Period that is "deferred and added to Total Development Costs but will not be paid until the Completion Date at which time the Construction Period Rent amount will be amortized and paid over the Fixed Term beginning with the Completion Date, in equal monthly installments as part of the payments of Base Rent."  Lease § 3.1(a).  Finally, the rent obligations include "Percentage Rent," which equals 1.75% of revenues of the hospital for the preceding month.

59.     In sum, the Lease's rent obligations have the construction and development costs for the operation already "baked into" them.  The parties contractually agreed that rent would cover all of the expenses associated with the Construction.  As a result, the MPT Proof of Claim seeks double-recovery for these costs which is impermissible.  *See*, *e.g.*, *Quality Equip. Leasing, LLC v. Alabama Logistics, LLC*, No. 2:17-CV-00127-AKK, 2017 WL 4304626, at *3 (N.D. Ala. Sept. 28, 2017) ("Plaintiffs' request for liquidated damages under the contract is denied. The amount requested as liquidated damages exactly duplicates the amount requested as actual damages because the Plaintiffs are not seeking to recover the full accelerated value of the leases at the time of default. Instead, the Plaintiffs seek only liquidated damages covering the time between default and termination of the lease agreements, and **the lease agreements provide that liquidated damages are calculated in the same way as actual damages**, i.e. via determining the value of the rental payments due and not paid under the lease. **Consequently, an award of liquidated damages, in addition to actual damages, would amount to an impermissible double recovery for the same injury**.") (emphasis added).

60.     The Construction Period Rent should have been amortized over the fifteen-year lease term.  To deem all of it due and payable in the pre-termination period is not consistent with the Lease.  While the documents provided are unclear and require further review and analysis, they seem to indicate a Base Rent of anywhere from $410 thousand to $480 thousand per month. Taking the midpoint of that range of $445 thousand yields $5.34 million of prepetition unpaid rent. This calculation, however, implies a Total Development Cost of almost $50 million which exceeds the stated figures.  If there were in fact $4.9 million of additional construction costs above what was calculated in the initial Total Development Cost (which was used to calculate Base Rent), then 10.75% of this amount, or $530 thousand per annum should be added to the Base Rent.  While

23

even this amount appears overstated, no more than $5.87 million should be outstanding for prepetition unpaid rent, including Construction Period Rent.

61.     The pre-petition rent amount alleged by MPT also appears to double-bill for base rent, plus "holdover rent."  It is unclear where MPT is obtaining the "holdover rent" amount, but in a typical commercial lease situation, the holdover rent would be the base rent, plus a premium. It would not be the full base rent, plus the increased base rent, which appears to be what is included in MPT's calculations.  As such, MPT's claim for pre-petition rent should be no more than $5.87 million.

62.     Because the amounts included in the MPT Proof of Claim do not appear to match the numbers in the Lease and supporting documents, Objector cannot make a clear and accurate assessment of the total, proper amount of pre-petition damages without further discovery and back-up documentation to support the amounts claimed.  Regardless, it appears that the pre-petition damages claim is substantially over-stated and should be significantly reduced.

**B.     The Rejection Damages Claim Amount is Overstated.**

63.     The MPT Proof of Claim asserts a section 502(b)(6) in an amount of $11,757,946.35.  MPT Proof of Claim, Ex. F.  In so doing, MPT asserts that the total amount of post-petition rent due and owing under the term of the Lease is $78,386,308.99.  Yet, MPT conveniently fails to acknowledge a number of critical facts necessary to determine the proper amount of any rejection damages claim—namely, the mitigation efforts it took and received to offset the $78 million amount claimed.

64.     This is critical, of course, because "[u]nder § 502(b)(6), the allowable amount of a landlord's claim is equal to the lesser of (i) its total rejection damages, **which may take mitigation into account**, and (ii) the statutory cap computed under § 502(b)(6)."  *In re Episode USA, Inc.,*

202 B.R. 691, 696 (Bankr. S.D.N.Y. 1996) (emphasis added and citations omitted); *see also Unsecured Creditors' Comm. v. Strobeck Real Estate (In re Highland Superstores)*, 154 F.3d 573, 579 (6th Cir. 1998) (collecting cases for proposition that courts in the Sixth Circuit have "uniformly held that a lessor's damages are computed in accordance with the terms of the debtor's lease and applicable state law, and then are limited by application of section 502(b)(6)"); *In re Q-Masters, Inc.*, 135 B.R. 157, 159 (Bankr. S.D. Fla. 1991) ("In determining the allowance of a claim under § 502(b)(6), the Court is called upon to first calculate what actual damages are recoverable by the landlord under state law as a result of the debtor's breach of the lease. The Court must then determine if this amount exceeds the statutory ceiling imposed by § 502(b)(6) and if so, the Court must limit the claim to the amount authorized under § 502(b)(6).") (citation omitted).

65.     Indeed, "Section 502(b)(6)(A) is not a formula for calculating damages; it is simply a method to cap damages calculated under the terms of the lease and state law." *In re USinternetworking, Inc.*, 291 B.R. 378, 380 (Bankr. D. Md. 2003) (citing *Steven Windsor, Inc.*, 201 B.R. 133, 135 (Bankr.D.Md.1996)); *accord In re Peters*, 2004 Bankr. LEXIS 787, at *9 (Bankr. E.D. Pa. May 7, 2004) ("The amount of a landlord's damage claim before application of § 502(b)(6) is ascertained by reference to the lease and applicable state law.") (citing *In re Fifth Ave. Jewelers*, 203 B.R. at 376); *In re Highland Superstores*, 154 F.3d at 579 (stating that courts have "uniformly held that a lessor's damages are computed in accordance with the terms of the debtor's lease and applicable state law, and then are limited by application of section 502(b)(6)") (citing *In re Gantos, Inc.*, 176 B.R. 793, 795 (Bankr.W.D.Mich.1995)); *In re Iron Oak Supply Corp.*, 169 B.R. 414, 416–17 (Bankr. E.D. Cal.1994) (same); *In re Thompson*, 116 B.R. 610, 613 (Bankr. S.D. Ohio 1990) (same).

66.     Although MPT has chosen to hide these facts from the Court and other parties in interest, MPT did, in fact, significantly mitigate its damages following the termination of the Lease. As discussed above, MPT provided notice of termination and terminated the Lease in January 2009.  MPT re-leased the hospital facility only six months later in July of 2009.  *See* **Ex. C**.  Under the terms of this new lease, MPT received rent of $2 million per year, plus up to an additional $1 million in profit sharing per year. *Id.*  Then, in August of 2014, MPT sold the leased premises for $35 million. *See* **Ex. D**.  Additionally, MPT received a judgment against the guarantors of the Lease in the amount of $3.8 million, which it settled for $1.4 million.  *See* Settlement Agreement § 1.1.  MPT also had a letter of credit in the amount of $3,977,500.00 that it, in all likelihood, drew down upon when the Debtor defaulted on the Lease. *See* Lease § 41.7.

67.     In order to ascertain the correct amount of MPT's rejection damages claim, one must first discount the total claimed rejection damages amount of $78 million, minus all amounts it received as mitigation, back to net present value.  *See In re USGen New England, Inc.*, No. 03-30465 PM, 2007 WL 1074055, at *8 (Bankr. D. Md. Jan. 23, 2007) ("Tennessee Gas must discount its claim, minus mitigation, back to its net present value."); *In re Mirant Corp.*, 332 B.R. 139, 156–57 (Bankr. N.D. Tex. 2005) (citing 11 U.S.C. § 502(b)); *In re Stembridge*, 394 F.3d 383, 387–88 (5th Cir.2004); *In re Loewen Group Int'l, Inc.*, 274 B.R. 427, 434–35 (Bankr. D. Del. 2002)). In *Mirant*, the court found that a discount rate must be applied to the amount of speculative future rent to account for the risk associated with the non-performance of the breaching party at the time the parties entered into the contract—the purpose of the discount rate is "to reduce the [c]laim to an amount consistent with the allowed amounts of other claims." 332 B.R. at 158.

68.     Here, according to the MPT Proof of Claim, the various promissory notes entered into by the parties in 2005 bore interest at a rate of 10.75% per annum. *See* MPT Proof of Claim,

Exhibits C-E thereto. Because the promissory notes were entered into contemporaneously with the Lease, the 10.75% interest rate figure is appropriate to use as the discount rate. *See In re USGen New England,* 2007 WL 1074055, at *8 ("According to 2002 financial statements, Debtor's credit facility bore an interest rate of LIBOR plus credit spread. As the contracts here were entered into in August 2002, this is the appropriate discount rate to be applied to Tennessee Gas' claim.").

69.     Before reducing the claim to net present value, it is necessary, as discussed above, to first reduce the total rejection damages figure of $78,386,308.99 by amounts MPT received from mitigating its damages. Assuming MPT received the full amount of the profit sharing it was entitled to under the new lease, MPT collected $3 million per year from July of 2009 through and including August of 2014 when it sold the property. For this 61-month time period, therefore, MPT received a total of $15,250,000. Under the terms of the Lease with the Debtor, MPT would have received $24,903,983 during this same 61-month period. The difference is $9,653,983 in rejection damages for this period, prior to reduction to net present value. Using a discount rate of 10.75%, the total rejection damages claim for this portion of the claim equals $7,181,129.

70.     The remaining portion of MPT's rejection damages claim equals $53,890,586 for the 11 years of rent it would have received under the Lease from the time the property was sold until the term of the Lease expired. Applying the same discount rate, the net present value of this portion of the rejection damages claim is $30,750,619. But because the property sold for $35 million in 2014, MPT has no claim to damages for any period of time after the sale inasmuch as the sale of the property more than compensated it for the loss of future rents under the Lease. *See, e.g.*, *McGuire v. City of Jersey* City, 593 A.2d 309, 313 (N.J. 2003). In *McGuire*, the New Jersey Supreme Court held that the lessor's sale of the property satisfied his duty to mitigate damages arising from breach of the lease, but terminated his right to seek future damages for lost rental

27

income after the time of sale, because "the sale price approximated the value of the future rentals." *Id.* at 313. The court explained that, because "the sale price of commercial real estate can be correlated to the present value of the property's future stream of rental income," the lessor's sale of the property compensates him for expected future rental income. *Id.* at 315. Bankruptcy courts addressing the issue of lease rejection damages are in accord. *See*, *e.g.*, *In re Timber Lodge Steakhouse, Inc.*, 377 B.R. 604 (Bankr. D. Minn. 2007), *aff'd in part sub nom. In re Shen Ko Inv. Grp., LLC v. Timber Lodge Steakhouse, Inc.*, No. BKY. 06-41228 (DDO), 2008 WL 2003108 (D. Minn. May 7, 2008) (holding that landlord mitigated its damages by the sale of the leasehold property to a third party after rejection of the lease by debtor and, thus, landlord was not entitled to any damages under the rejected lease for the period following consummation of the sale); *see also Ozarks Unlimited Res. Co-op., Inc. v. Daniels*, 969 S.W.2d 169, 175 (1998) ("[W]hen a landlord reenters and resumes the use and enjoyment of the premises for his own account, he terminates the lease, as a matter of law, insofar as his right to recover subsequently accruing rent is concerned. O.U.R. asserts that Daniels accepted the surrender of the leasehold and resumed their use and enjoyment of the property by selling it to another party. Daniels, in effect, terminated the lease and the accrual of damages under the lease for lost rent.") (internal cites and marks omitted); *Falco v. Alpha Affiliates, Inc.*, No. CIV.A. 97-494 MMS, 1997 WL 782011, at *1 (D. Del. Dec. 10, 1997) ("Although the lease was initially set to expire on July 31, 1999, as of July 31, 1997, Falco completely mitigated any further damages by finding a permanent tenant to occupy the premises for the remainder of the lease term."); *In re Phar-Mor, Inc.*, 336 B.R. 326, 334 (Bankr. N.D. Ohio 2006) ("[O]nce a lessor mitigates its damages by re-letting the equipment, the lessor cannot claim damages from the debtor for the period covered by the new lease—even if subsequently the new lessee defaults in its obligations to the lessor. To hold otherwise would

28

require the Court to attempt to forecast the viability of each lessee in a mitigating lease to determine if the mitigation will be 'successful.'").

71.     Accordingly, the most MPT is entitled to under common law calculation of rejection damages is $7,181,129.  Because this amount is less than the section 502(b)(6) cap amount of $11,757,946.35, this portion of the MPT Proof of Claim must be reduced to $7,181,129. *See In re Episode USA, Inc.,* 202 B.R. at 696 ("Under § 502(b)(6), the allowable amount of a landlord's claim is equal to **the lesser of** (i) its total rejection damages, which may take mitigation into account, and (ii) the statutory cap computed under § 502(b)(6).") (emphasis added and citations omitted); *In re Highland Superstores*, 154 F.3d at 579 (stating that courts have "uniformly held that a lessor's damages are computed in accordance with the terms of the debtor's lease and applicable state law, and then are limited by application of section 502(b)(6)") (citing *In re Gantos, Inc.*, 176 B.R. 793, 795 (Bankr.W.D.Mich.1995)); *In re Iron Oak Supply Corp.*, 169 B.R. 414, 416–17 (Bankr.E.D.Cal.1994) (same); *In re Thompson*, 116 B.R. 610, 613 (Bankr.S.D.Ohio 1990) (same).

72.     The following payments and sources of value must also be applied against any allowed claim, though MPT makes no mention of them in the MPT Proof of Claim.  First, MPT prevailed in the Delaware State Court litigation and won a $4.1 million total judgment, including pre judgment interest.  *See* Settlement Agreement.  That MPT agreed to settle the judgment for a discounted amount of $1.4 million is of no consequence.  The full amount of the judgment must be applied to mitigate any claim.  Second, MPT received a $1.2 million "operating expense contribution" which bought down the parent guarantee from $5 million to $3.8 million.  Third, the lease makes mention of $3.9 million in letters of credit or cash on deposit with MPT to further

secure the Debtor's obligations under the Lease. *See* Lease § 41.7. Presumably these funds were drawn down or retained by MPT and must also be offset against any theory of damages.

73. Combined, these additional mitigation payments reduce the total amount of the post-petition rent claim to $0.00. Even if the Court were to only count the $1.4 million settlement amount, as opposed to the full $4.1 judgment, the most MPT should receive on its post-petition rent claim is $603,629.00—roughly five percent (5%) of the $11,757,946.35 claimed by MPT.

74. The following charts[11] provide a breakdown of the analysis above:

| PRE-PETITION DAMAGES CLAIM | | | |
|---|---|---|---|
| **MPT Claim** | **MPT Claim Amount** | **Amount MPT is Entitled To** | **Explanation** |
| Development Payments | $4,057,883.00 | $0 | The Development Payments Amount has already been included within the amount of Pre-Petition Rent (**$8,246,543.42**). Total Development Costs are defined in Section 3.1 of the Lease to include all fees and expenses, including legal fees and appraisal costs, among other expenses, incurred in the development of the property. The Lease's rent obligations have the Development Payments Amount "baked into" them. As a result, MPT is not entitled to "double recovery" on the Development Payments Amount and MPT's Claim must be reduced in the amount of **$4,057,883.00**. |
| Construction Period Payments | $4,878,231.12 | $0 | The Construction Period Payments Amount has already been included within the amount of Pre-Petition Rent (**$8,246,543.42**). Section 3.1 of the Lease includes "Construction Period Rent," which amounts to deferred rent during the Construction Period that is "deferred and added to Total Development Costs but will not be paid until the Completion Date at which time the Construction Period Rent amount will |

---

[11] These charts are included as an aid to the Court in analyzing the issues regarding the claim. No amount included in the charts is a concession that any amount included is due and owing.

30

| | | | |
|---|---|---|---|
| | | | be amortized and paid over the Fixed Term beginning with the Completion Date, in equal monthly installments as part of the payments of Base Rent." As a result, MPT's claim must be reduced in the amount of **$4,878,231.12**. |
| Other Pre-Petition Payments | $9,297,873.76 | At most, $5.87 million. | The documents supporting the MPT Proof of Claim are unclear and require further review and analysis.<br><br>They seem to indicate a Base Rent of anywhere from $410 thousand to $480 thousand per month. Taking the midpoint of that range of $445 thousand yields $5.34 million of prepetition unpaid rent.<br><br>This calculation, however, implies a Total Development Cost of almost $50 million which seems to exceed the stated figures.<br><br>If there were in fact $4.9 million of additional construction costs above what was calculated in the initial Total Development Cost (which was used to calculate Base Rent), then 10.75% of this amount, or $530 thousand per annum should be added to the Base Rent.<br><br>While even this amount appears overstated, **no more than $5.87 million** should be outstanding for prepetition unpaid rent, including Construction Period Rent.<br><br>Additionally, the $9,297,873.76 alleged rent amount appears to double-charge for rent and "holdover rent," which amount does not appear in the terms of the Lease. |
| **Total Pre-Petition Claim:** | $18,233,987.88 | Unclear, but substantially less than the amount claimed. | Despite Objector's best efforts, it has been unable to reconcile the numbers listed in the MPT Proof of Claim with the documentation attached in support of the claim. As such, Objector cannot provide a reliable calculation as to the amount owed for pre-petition damages, but is confident that it is substantially lower than the amount claimed. Further discovery is needed on this point. |

| POST-PETITION REJECTION DAMAGES CLAIM | | | |
|---|---|---|---|
| **MPT Claim** | **Claim Amount** | **Amount MPT is Entitled To** | **Explanation** |
| Post-Petition Rejection Damages | $11,757,946.35 | $0.00<br><br>Or<br><br>$603,629.00 (if settlement amount used instead of judgment amount.) | **$24,903,983** (amount MPT would have received from July of 2009 through August 2014 when it sold the property if the Debtor had not breached the lease) – **$15,250,000** (amount MPT received by mitigating damages during this 61-month period) = **$9,653,983**.<br><br>Using a discount rate of **10.75%,** MPT is entitled to recover **$7,181,129** in total post-petition rejection damages.<br><br>MPT has no claim to damages for any period of time after the sale of the property as the sale of the property more than compensated MPT for the net present value of future rents under the Lease.<br><br>Further subtracting the **$3,977,500** in letter of credit reductions and the **$4,100,000** judgment, without even addressing the operating expense contribution, reduces the post-petition rent amount to **$0.00**<br><br>At most, if the judgment amount were reduced to the settlement amount of $1.4 million, MPT would still only be entitled to a post-petition damages claim of **$603,629.00.** |

## **CONCLUSION**

75.     WHEREFORE, the Objector respectfully requests that the Court disallow the MPT

Proof of Claim in its entirety and grant it such other and further relief as is just and proper.

## RESERVATION OF RIGHTS

76.     Nothing contained in this Objection or any action taken by the Objector is intended or should be construed as: (a) an admission as to the validity of any proof of claim filed against Debtor, in whole or in part; (b) a waiver of the Objector's right to dispute any proof of claim filed against Debtor on any grounds, in whole or in part; (c) a promise or requirement to pay any proof of claim filed against Debtor; or (d) a waiver or limitation of the Objector's rights, claims or defenses, whether under the Bankruptcy Code or otherwise.

## NO PRIOR REQUEST

77.     No prior request for the precise relief sought in this Objection has been made to this Court or any other court.

Dated November 10, 2021.

Respectfully submitted,
**NELSON, MULLINS, RILEY &**
**SCARBOROUGH LLP**

/s/ Shane G. Ramsey
Shane G. Ramsey (BPR 35528)
Woods Drinkwater (BPRN 33838)
John T. Baxter (BPR 35405)
Nelson, Mullins, Riley & Scarborough LLP
150 Fourth Avenue North, Suite 1100
Nashville, Tennessee 37219
Phone: 615.664.5355
Fax: 615.664.5399
shane.ramsey@nelsonmullins.com
woods.drinkwater@nelsonmullins.com
john.baxter@nelsonmullins.com
*Counsel for Pioneer Funding Group, LLC*

## CERTIFICATE OF SERVICE

I certify that the foregoing document has been served upon all counsel of record for the parties at interest in this cause by placing a true and correct copy of same in the United States mail, postage prepaid, in a properly addressed envelope; or by email; or electronically through ECF; or by facsimile; or by hand delivering same to each attorney of record as follows:

All counsel and parties of record via ECF

Dated: November 10, 2021

/s/ Shane G. Ramsey
Shane G. Ramsey