# EXHIBIT L

# EXHIBIT 1 TO THOMPSON BURTON'S ANSWER TO PIONEER FUNDING GROUP, LLC'S FIRST SET OF INTERROGATORIES Nos. 1-11

## 1. DEFINITIONS:

For purposes of this Summary, the following terms shall have the meanings ascribed below.

**(a)** "**Delaware Trustee**" shall mean Alfred T. Giuliano as trustee for DSI Parent, DSI Hospitals, and DSI Facility.

**(b)** "**Berluti**" shall mean Berluti McLaughlin & Kutchin LLP.

**(c)** "**Bucks County**" shall mean Bucks County Oncoplastic Institute, LLC.

**(d)** "**CDSI I**" shall mean CDSI I Holding Company, Inc.

**(e)** "**Mr. Chieuh**" was counsel for the Delaware Defendants.

**(f)** "**Delaware Adversary**" shall mean the adversary proceeding captioned *Alfred T. Giuliano as Chapter 7 trustee for the jointly administered Chapter 7 estates of Debtors DSI Renal Holdings, LLC, DSI Hospitals, Inc., and DSI Facility Development, LLC v. Michael Schnabel, et al*., Case No. 14-50356-KBO.

**(g)** "**Delaware Bankruptcy**" shall mean the chapter 7 case *In re DSI Renal Holdings, LLC* pending in the United States Bankruptcy Court for the District of Delaware, Case No. 11-11722

**(h)** "**Delaware Defendants**" shall mean the defendants in the Delaware Adversary Proceeding.

**(i)** "**Dilworth Paxson**" shall mean Dilworth Paxson LLP.

**(j)** "**DSI Facility**" shall mean DSI Facility Development, LLC.

**(k)** "**DSI Holding**" shall mean DSI Holding Company, Inc., which was the parent of DSI Parent.

**(l)** "**DSI Hospitals**" shall mean DSI Hospitals, Inc.

**(m)** "**DSI Parent**" shall mean DSI Renal Holdings, LLC, which was the wholly-owned subsidiary of DSI Holding prior to 2010.

1

**(n)** "**DSI Renal**" shall mean DSI Renal, Inc., which was an operating company operating dialysis clinics and a subsidiary of DSI Parent.

**(o)** "**Bucks County Trustee**" or "**Trustee Lemeh**" shall mean Eva M. Lemeh, trustee for Bucks County.

**(p)** "**Friedman**" shall mean Friedman Kaplan Seiler & Adelman LLP.

**(q)** "**H3GM**" shall mean Harwell, Howard, Hyne, Gabbert & Manner, P.C.

**(r)** "**Healthclaim**" shall mean Healthclaim Recovery LLC, an entity owned and controlled by the Delaware Defendants.

**(s)** "**Larry McMichael**" or "**Mr. McMichael**" shall mean Larry McMichael, a partner at Dilworth Paxson.

**(t)** "**Milbank**" shall mean Milbank, LLP.

**(u)** "**Morris Nichols**" shall mean Morris, Nichols, Arsht & Tunnell LLP.

**(v)** "**MPT**" shall mean MPT of Bucks County, L.P., a creditor of Bucks County, DSI Parent, and DSI Holding.

**(w)** "**Paul Weiss**" shall mean Paul, Weiss, Rifkind, Wharton & Garrison LLP.

**(x)** "**Peter Hughes**" or "**Mr. Hughes**" shall mean Peter C. Hughes.

**(y)** "**Phillip Young**" or "**Mr. Young**" shall mean Phillip G. Young.

**(z)** "**Pioneer**" shall mean Pioneer Funding Group LLC.

**(aa)** "**Potter**" shall mean Potter Anderson & Corroon LLP.

**(bb)** "**Mr. Stein-Sapir**" shall mean Adam Stein-Sapir.

**(cc)** "**Steve Coren**" or "**Mr. Coren**" shall mean Steven M. Coren of the law firm Kaufman, Coren & Ress, P.C., counsel for the Delaware Trustee.

**(dd)** "**Michael Menkowitz**" or "**Mr. Menkowitz**" shall mean Michael G. Menkowitz of Fox Rothschild LLP, counsel for the Delaware Trustee.

**(ee)** "**Schiff**" shall mean Schiff Hardin LLP.

**(ff)** "**Thompson Burton**" shall mean Thompson Burton PLLC.

## 2.   KEY CASES AND DOCKETS

### (a)   *In re Bucks County Oncoplastic Institute, LLC, 3:09-bk-03570 (Bankr. M.D. Tenn)*

#### (I)   KEY DOCKET ENTRIES AND SUMMARY OF EVENTS

(1)   (3/30/2009): Bucks County files for Chapter 7 bankruptcy relief. Trustee Lemeh is appointed to serve as Chapter 7 trustee on the same day.

(2)   (4/22/2009): Trustee Lemeh moves to employ Phillip Young (then practicing as a sole practitioner), which was granted by order entered 5/27/2009. Phillip Young was employed primarily to pursue certain avoidance actions. Mr. Young filed thirteen such actions in September 2009. One of those avoidance actions was against DSI Holding, the parent company of DSI Parent. When Mr. Young formed Garfinkle, McLemore & Young, PLLC in early 2010, that firm was substituted as counsel.

(3)   (4/2009 to 5/2011): Mr. Young pursues all thirteen avoidance actions and associated adversary proceedings, which generated a recovery of ~$200,000 for the Bucks County estate. The Adversary Proceeding filed against DSI Holding was related to ~$90,000 that had been transferred from Bucks County in the 90 days prior to Bucks County's bankruptcy filing.

DSI Holding retained the now-defunct H3GM law firm to defend DSI Holding. H3GM had previously represented Bucks County in the bankruptcy proceeding, which led Mr. Young to object to H3GM representing both the debtor (Bucks County) and a defendant in an Adversary Proceeding (DSI Holding). This objection process drug on parallel with efforts to resolve the Adversary Proceeding against DSI Holding. H3GM was hesitant to provide documents that would establish the relationship between Bucks County and DSI Holding. This became a sticking point between H3GM and Mr. Young on multiple occasions. DSI Holding seemed to want to focus simply on a resolution of the Adversary Proceeding without providing Mr. Young documentation that would prove, or disprove, DSI Holding's relationship with Bucks County. Moreover, DSI Holding did not want to repay the fraudulent transfers, claiming it was insolvent.

Ultimately, Trustee Lemeh agreed to accept $45,000 in settlement of the Adversary Proceeding against DSI Holding. Neither DSI Holding nor H3GM ever sent out notices to the creditors of Bucks County concerning the potential conflict, as the Court had directed. DSI Holding asked for a very broad release in the settlement documents, to which Trustee Lemeh refused to agree. Trustee Lemeh insisted that only the causes of action related to the Adversary Proceeding be released, and DSI Holding and its counsel ultimately relented. As is explained below, if Mr. Young and Trustee Lemeh had been unable to resist this request, it would have jeopardized any future recovery for the Bucks County estate. Trustee Lemeh and Mr. Young questioned the relationship between the Bucks County and DSI Holding during the course of the case administration. There seemed to be significant confusion among Bucks County's creditors about who owed the debt, whether Bucks

County or DSI Holding. Many invoices were addressed to DSI Holding but were paid by Bucks County, or vice versa. Bucks County and its counsel explained this away by claiming that DSI Holding was a third party, outsourced operator of Bucks County's "back office" functions. Thus, they claimed that some creditors got confused. However, it also seemed to Trustee Lemeh and Mr. Young that there was considerable overlap between the employees/officers of DSI Holding and those of Bucks County. Many of Bucks County's representatives would also call purporting to represent the interests of DSI Holding. For example, Trustee Lemeh and Mr. Young found that Jay Yalowitz occupied important roles in both companies and seemed to get defensive whenever Mr. Young asked about the relationship between the companies. In summary, the relationship between Bucks County and DSI Holding was suspiciously close. After resolving claims issues and making distributions, Trustee Lemeh submitted a final report in June 2012.

(4)     (7/9/2012): after making distributions, the Bucks County case was closed.

(5)     (7/2012 – 1/2013): Trustee Lemeh was informed that on June 3, 2011, DSI Holding / DSI Parent (DSI Holding merged into DSI Parent in 2010) had filed for chapter 7 bankruptcy relief in Delaware. After some diligence, Mr. Young learned that the bankruptcy had been filed on June 3, 2011, shortly after the resolution of Bucks County's adversary proceeding against DSI Holding. Bucks County was not listed as a creditor of DSI Parent in the Delaware Bankruptcy, so no formal notice was provided Bucks County. Bucks County only received notice of the Delaware Bankruptcy because DSI Parent had filed a notice of bankruptcy in the Adversary Proceeding against DSI Holding. In early 2013, Mr. Young received a telephone call from the Delaware Trustee and his counsel. The Delaware Trustee informed Mr. Young that he thought the Delaware Defendants had committed fraud against Bucks County.

(6)     (2/7/2013): Based upon information provided by the Delaware Trustee, Trustee Lemeh asked the United States Trustee to reopen the Bucks County bankruptcy case in Tennessee, which was accomplished on February 7, 2013.

(7)     (2/2013-7/2013): Trustee Lemeh and Mr. Young communicate with the Delaware Trustee, providing the Delaware Trustee with information and documents that had been collected in the Bucks County bankruptcy case that would be helpful in the Delaware Bankruptcy. The Delaware Trustee performed doing due diligence into allegations that DSI Parent's officers and directors perpetrated a fraud upon the creditors of DSI Parent and DSI Holding.

(8)     (8/2013): Mr. Coren, counsel for the Delaware Trustee emailed Mr. Young a draft complaint against the officers, directors and certain shareholders of DSI Holding and DSI Parent. The draft complaint was voluminous and detailed, and alleged damages exceeding $600 million. In essence, the complaint alleged that the shareholders of DSI Holding / DSI Parent constructed a complex "restructuring" plan the results of which were to burden Bucks County with substantially all of the debt, and freeing up valuable assets to be spun out into a newco. The fraudulent scheme had been carefully planned with advice from very experienced attorneys and financial advisors. After reviewing the draft complaint, Trustee Lemeh and Mr. Young agreed that Trustee Lemeh should file a claim in the Delaware Bankruptcy for the

4

unpaid claims of Bucks County, under a theory that DSI Parent was jointly and severally liable for those debts as a result of the fraud. This theory upon which the claim was filed was neither simple nor a given. After reviewing all of the information sent to Mr. Young by the Delaware Trustee, and given what was learned during the Bucks County bankruptcy, Trustee Lemeh and Mr. Young reached the conclusion that the Bucks County case was intentionally filed in Tennessee, far away from its operations in suburban Philadelphia, in hopes that the bankruptcy (and Bucks County's relationship with DSI Parent / DSI Holding) would go unnoticed by the creditors. Mr. Young and Trustee Lemeh theorized that DSI Parent and Bucks County hoped that creditors would do little more than file a claim in the Bucks County case and then, when DSI Parent subsequently filed bankruptcy, creditors would not file claims or bring causes of action in that case, believing that the debt had already been discharged as part of the Bucks County case.

The significant part of the decision to file a claim, and the legally complex element, was how to convince the Delaware Trustee and other parties in interest that it was Trustee Lemeh, and not any of the individual creditors, who had standing to assert claims against DSI Parent's estate. After all, very few of Bucks County's creditors had filed claims in the Delaware Bankruptcy; the total of duplicative claims was meager when compared to the total potential liability. After researching the issue, Trustee Lemeh and Mr. Young took the position that the Bucks County estate had a claim against DSI Parent for fraud and/or for joint and several liability because the two companies were so comingled. Mr. Young and Trustee Lemeh asserted that Trustee Lemeh, and not the individual creditors (who had chosen not to pursue their claims), had standing to pursue this claim because, upon the filing of the Bucks County bankruptcy, the fraud and joint and several liability claims became property of the estate pursuant to 11 U.S.C. § 541. Mr. Young believed that this cause of action belonged to Bucks County and only belonged to the creditors derivatively.

Before the Bucks County claim was filed in the Delaware Bankruptcy, Mr. Young received a call from Glenn Rose (with H3GM), who had represented the Bucks County in its bankruptcy case and also represented DSI Holding in an adversary proceeding related to that case. Mr. Rose informed Mr. Young that filing of the claim was likely to subject Mr. Young to personal legal attacks from the Delaware Defendants, including threats of Rule 11 sanctions. Mr. Rose warned Mr. Young that this litigation was going to be ugly, that Mr. Young did not want to be in the middle of it, and that Mr. Young should immediately abandon any plans to file the claim. Mr. Rose said that Trustee Lemeh had no standing to pursue fraud claims or joint and several liability claims on behalf of the estate, and that those claims belonged only to creditors (who had chosen not to pursue them). Mr. Rose also sent Mr. Young a portion of a response to one of the Delaware Trustee's pleadings, meant to serve as the Delaware Defendants' counter-narrative of the events as alleged by the Delaware Trustee. Mr. Rose advised Mr. Young to carefully review that narrative before asserting any claim. Mr. Young did so, but ultimately told Mr. Rose that Trustee Lemeh and Mr. Young were confident in the validity of the claim, and that Mr. Young refused to capitulate to the threats of the Delaware Defendants.

(9)  (8/22/2013): On August 22, 2013, Mr. Young filed, on behalf of Trustee Lemeh, Claim No. 16 in the Delaware Bankruptcy case in an amount of $108,618,908.47. This amount equaled the amount of unpaid claims that existed in the Bucks

5

County bankruptcy case. Mr. Young later amended the claim on October 11, 2013, to add interest and attorneys' fees, for a new claim total of $151,822,439.82.

The backlash to the claim was immediate. Mr. Young received a number of calls from Stan Chieuh, counsel for the Delaware Defendants. Mr. Chieuh was always polite and professional, but he was direct in his criticism of the legal basis of Trustee Lemeh's claim. Mr. Chieuh would ask Mr. Young questions intended to undermine confidence in the claim, send Mr. Young documents and testimony to rebut the Delaware Trustee's theory of the case, and continually remind Mr. Young that the Delaware Defendants were going to defend the case very aggressively, implying that Mr. Young might have Rule 11 liability. Those conversations occurred with some frequency for 3-6 months after the filing of the Claim No. 16, as did conversations with the Delaware Trustee's counsel in which the Delaware Trustee would provide Mr. Young with information learned in discovery.

(10) (1/2014 – 8/2018) Between early 2014 through the summer of 2018, Mr. Young's communications from various counsel in Delaware was less frequent. During this time, Mr. Young continually monitored the dockets in the Delaware Bankruptcy and in the Adversary Proceeding so that Mr. Young could provide updates to Trustee Lemeh. Mr. Young also called the Delaware Trustee's counsel periodically to get more insight into the case, and his counsel called Mr. Young periodically to get additional information from the Bucks County bankruptcy. During this time, Mr. Young would also occasionally receive calls from the Delaware Defendants' counsel, all of which were intended to convince Mr. Young that the case was not going well for the Delaware Trustee and to cast doubt on the validity of the Delaware Trustee's claim.

(11) (8/2018) In the summer of 2018, both Trustee Lemeh and Mr. Young received subpoenas to testify in the Delaware Adversary Proceeding. Trustee Lemeh was subpoenaed to testify on the afternoon of August 14, 2018; Mr. Young was subpoenaed to testify on the morning of August 15, 2018. Mr. Young defended Trustee Lemeh's deposition on August 14. Upon Mr. Young and Trustee Lemeh's arrival at the deposition, it was readily apparent that these depositions were critical to the Delaware Defendants' defense of the case. Trustee Lemeh's deposition was held in a large conference room at Bradley, and the room was full of counsel representing the Delaware Defendants. Each Delaware Defendant was represented by counsel, and most Delaware Defendants were represented by two attorneys, a senior partner and a junior partner / senior associate.

(12) (8/14/2018): Trustee Lemeh's deposition lasted several hours on August 14, 2018. The primary questioning of Trustee Lemeh seemed to revolve around what she knew about the relationship between Bucks County and DSI Holding, what she was told by the Delaware Trustee, and why she chose to file the proof of claim in Delaware. It was obvious from their questioning of Trustee Lemeh that the Defendants did not believe that she and Mr. Young were capable of developing the legal theory upon which the claim was based without input from the Delaware Trustee and his counsel. The Delaware Defendants' counsel repeatedly asked Trustee Lemeh whether the Delaware Trustee instructed her to file the claim and/or whether he provided to her the theory upon which the claim was based. Trustee Lemeh was offended by this line of questioning as it seemed to cast doubt on the abilities of herself and Mr. Young as lawyers, when both had been practicing for quite some time prior to the filing of the claim.

6

Trustee Lemeh's responses to most of the questions asked of her was essentially, "Ask Phillip Young". This is because the Delaware Defendants' counsel asked most of their questions about legal theories and the mechanism by which those legal theories were executed. Those were the types of decisions that Trustee Lemeh would allow Mr. Young to make and Mr. Young would simply report back to Trustee Lemeh on the progress. Trustee Lemeh would make the big-picture decisions and then would leave it to Mr. Young to implement those decisions as Mr. Young saw fit, reporting to Trustee Lemeh at every step of the legal process. Because of the questions the Delaware Defendants asked Trustee Lemeh, and because of her deference, Mr. Young knew that his deposition was likely to be lengthy and involved.

(13)     (8/15/2018): On August 15, 2018, Mr. Young arrived to the same conference room full of the same attorneys for his deposition. Mr. Young's associate, Justin Campbell, accompanied Mr. Young to defend the deposition. The deposition lasted most of the day. Most of the questions asked of Mr. Young centered around what Mr. Young had learned during the Bucks County bankruptcy, what questions Mr. Young asked during that bankruptcy, what kind of communications Mr. Young had with the Delaware Trustee and his counsel, and what factual basis Mr. Young had for filing the claim in the Delaware Bankruptcy case.

After the deposition was concluded, the attorney present for the Delaware Trustee walked Mr. Young to his car, told Mr. Young that he thought Mr. Young had done an excellent job, but warned Mr. Young that the Delaware Trustee believed the Delaware Defendants' strategy was going to be to attack the validity of the claim that Trustee Lemeh filed. The Delaware Trustee's counsel explained that, if the Delaware Defendants could get Mr. Young and Trustee Lemeh's claim dismissed, then the Delaware Defendants thought they could pay off all remaining claims in the Delaware Bankruptcy case with just a few million dollars. The Delaware Trustee's counsel warned that Mr. Young might be receiving a Rule 11 letter in the days to come but that, even if Mr. Young did not, Trustee Lemeh and Mr. Young needed to be prepared for an objection to Mr. Young and Trustee Lemeh's claim. The Delaware Trustee's counsel was convinced that an attack on Mr. Young and Trustee Lemeh's claim would be the Defendants' primary "defense" to the Adversary Proceeding.

Mr. Young continued monitoring the Adversary Proceeding over the next several months, awaiting a claim objection or some other collateral attack on the claim that Mr. Young had filed in Delaware for Trustee Lemeh. During the remainder of 2018 and most of 2019, the most substantive filings in the Delaware Adversary Proceeding were various motions for summary judgment, meant to narrow the issues involved in the case. Some were decided favorably for the Delaware Trustee, while others were decided favorably for the Delaware Defendants. Mr. Young reported the progress of these matters to Trustee Lemeh during this time.

(14)     (11/27/2019): On November 27, 2019 (DE 146 in the Delaware Bankruptcy), the day before Thanksgiving, Mr. Young was traveling to Texas with his family to visit relatives when Mr. Young began to receive a barrage of emails concerning new filings in the Delaware Bankruptcy. Among those filings was an objection to Trustee Lemeh's proof of claim, and pleadings related thereto. Mr. Young knew immediately that the timing of this

filing, the day before Thanksgiving and on the eve of the winter holiday season, was intended to disadvantage Trustee Lemeh in obtaining local counsel and defending the validity of the claim. Mr. Young called Trustee Lemeh immediately and asked for her permission to begin the search for Delaware counsel (since Mr. Young knew that Delaware Local Rules mandated that Trustee Lemeh retain local counsel). Once Mr. Young arrived at his family's home, Mr. Young spent a couple of hours on the telephone with Mr. Coren, counsel for the Delaware Trustee, to understand the big picture of these objections, and to try to identify local counsel who would be willing to step into this case at such a late date. Mr. Coren suggested that Mr. Young contact Larry McMichael, a partner with Dilworth Paxson, about serving as Trustee Lemeh's local counsel.

(15)  (11/29/2019 – 12/2019):  Mr. Young spoke with Mr. McMichael on the telephone on Friday, November 29, 2019, and provided Mr. McMichael information and documents about the Delaware Bankruptcy case, Trustee Lemeh's claim, and the claim objection. Mr. McMichael indicated that he was interested in possibly serving as Trustee Lemeh's local counsel but asked for some additional time to review the documents and to discuss the matter with his partners. Over the next couple of weeks, Mr. Young continued his discussions with Mr. McMichael and his partner, Peter Hughes. The parties recognized that because the Bucks County estate had no assets and no ability to pay fees, the only practical solution was for Dilworth Paxson to serve as local counsel in the Delaware Bankruptcy on a contingency arrangement. Mr. Young discussed this with Trustee Lemeh; she agreed to retain Dilworth Paxson on a contingency fee basis since the Bucks County estate was insolvent.

In discussions with Trustee Lemeh and Dilworth Paxson, it was agreed that it would be in the best interest of the Bucks County estate if Thompson Burton would convert to a contingency fee arrangement. Trustee Lemeh wanted to ensure that the estate was not paying a contingency fee plus an hourly rate, and Dilworth Paxson wanted to ensure that the two firms were being compensated similarly for similar work. Mr. Young agreed to convert Thompson Burton to a contingency arrangement because Mr. Young saw no way that the estate could pay Mr. Young's fees otherwise. At this juncture in the case, Mr. Young felt that litigation was likely to continue for at least four more years, that a host of appeals were likely, that a considerable amount of work would be required of Mr. Young, and that the outcome was very uncertain. Mr. Young felt that settlement of this matter was very unlikely. He had been told that the parties were more than $100 million apart in their evaluation of the value of the case, and he had observed that the Delaware Defendants were defending the case very aggressively, employing some of the nation's best known, and most expensive, law firms.

Before filing the motion to retain Dilworth Paxson on a contingency basis and to convert Thompson Burton's engagement to a contingency basis, Mr. Young discussed the matter with the United States Trustee's office. After Mr. Young's explanation of the situation, including that the estate was administratively insolvent, that the estate needed to retain Delaware counsel immediately, that Delaware counsel was only willing to accept a contingency arrangement, that the litigation was likely to be complex and lengthy, and that it would likely require a considerable amount of time, the United States Trustee agreed with the decision to employ both firms on a contingency basis.

8

Also at this time, due to the time Mr. Young expected this matter to take combined with the time required by one other pending matter on which Mr. Young was working, Mr. Young began turning away new clients and reassigning cases on which Mr. Young was working to other partners at his firm. Because his compensation was directly related to the number of hours Mr. Young actively bills on each file, this had a significant negative impact on Mr. Young's receivables.

(16)    (12/12/2019) DE 194 (Supp. Mot. to Emp. Special Counsel), DE 195 (Mot. to Emp. Special Counsel), DE 205 (Order Approving Application): Ultimately, Mr. Young assisted Trustee Lemeh in filing a motion to employ Dilworth Paxson on an emergency basis. At the same time, Mr. Young assisted Trustee Lemeh in filing a motion, on regular notice, seeking to employ Thompson Burton on a contingency basis. No party objected. Because the Dilworth Paxson motion was an emergency motion, the Court held a hearing to discuss the motion. At the hearing, Mr. Young reiterated the facts included in the motion, including that the law firms were seeking to be employed on a contingency arrangement and that a judgment of $150 million was not outside the realm of possibilities. Mr. Young answered all questions of the Court after which time it approved the motions, without objection.

The only party that inquired about the motions to employ, other than the United States Trustee, was Pioneer. Adam Stein-Sapir, a representative of Pioneer, reached out to Mr. Young by telephone and by email just before the motions to employ were filed. Mr. Stein-Sapir informed Mr. Young that Pioneer had purchased several claims in the case, including Siemens' claim in excess of $10 million, that he had been following the Delaware Bankruptcy, and that he wanted to be involved in the Bucks County case. Mr. Young explained to Mr. Stein-Sapir what actions Trustee Lemeh intended to take and the strategies Trustee Lemeh intended to employ. Mr. Stein-Sapir wanted to have significant input into Trustee Lemeh's approach. While Mr. Young was perfectly willing to keep Mr. Stein-Sapir informed, as a large creditor of the estate, Mr. Young tried to draw a line between keeping Mr. Stein-Sapir informed and allowing Mr. Stein-Sapir to influence Trustee Lemeh's decision making, since that is a trustee's independent duty.

In addition to discussing the case in general, Mr. Stein-Sapir wanted to discuss the potential retention of Dilworth Paxson. First, he wanted to suggest that Mr. Young contact another Delaware firm with whom he had previously worked and who, according to him, was willing to represent the estate on an hourly basis. Mr. Young informed him that Mr. Young was already significantly down the road with bringing Dilworth Paxson up to speed on the case, that the Delaware Trustee and his counsel were comfortable with Dilworth Paxson (which Mr. Young believed to be very important because of the coordination that would be required between the Delaware and Tennessee trustees in the litigation), and that Mr. Young doubted any attorney would be willing to represent the estate on an hourly basis once they learned that the estate was insolvent. Mr. Stein-Sapir was concerned about losing too large a percentage of the possible recovery to attorney fees. Mr. Stein-Sapir was especially concerned that the case might settle for something in excess of $100 million prior to any hearings. Mr. Young tried to assuage Mr. Stein-Sapir's concern with two things. First, Mr. Young informed him that, regardless of

9

the fee arrangement, both the Court and the United States Trustee's office would review the proposed fee to ensure that any fee was ethically permissible. Since Mr. Stein-Sapir was not an attorney, Mr. Young briefly explained to him the factors that must be met in Tennessee for a fee to be deemed ethical. In fact, Mr. Young included those factors in the motion to employ on a contingency basis, so that Mr. Stein-Sapir could clearly review what Mr. Young told him telephonically. Mr. Young did not, however, "negotiate" the terms of the motion. It was Mr. Young's idea to include the ethical considerations in the motion so that the standard of review would be clear. Mr. Young borrowed the language used in the motion from another motion to employ a law firm on a contingency basis from a different case.

Beyond explaining the legal reality of ethical considerations, Mr. Young also offered to discuss other fee arrangements with Mr. Stein-Sapir, other than the proposed contingency fee arrangement. Mr. Young explained to him that, since the estate was insolvent, the estate had little choice but to have counsel work on a contingency arrangement. Mr. Stein-Sapir asked whether Thompson Burton, and Dilworth Paxson or another Delaware firm, would consider going forward on an hourly basis if Pioneer advanced $30,000. Mr. Young briefly discussed this with Trustee Lemeh. After that discussion, Mr. Young informed Mr. Stein-Sapir that Trustee Lemeh was open to the concept of proceeding for some period of time on an hourly basis and then converting to a contingency, if necessary. However, Mr. Young told Mr. Stein-Sapir that $30,000 would be insufficient. Mr. Young suggested that Pioneer would need to advance at least $50,000 to even get beyond the claim objection that was set for hearing in February 2020. Even at that, Mr. Young and Trustee Lemeh felt they were just delaying an inevitable contingency arrangement, because they did not believe the case could be completed for $50,000. Nevertheless, if Pioneer would agree to advance $50,000, Mr. Young promised that Mr. Young would discuss that arrangement further with Trustee Lemeh, Dilworth Paxson, and/or some other Delaware counsel that might be willing to take the matter on an hourly basis. Pioneer was unwilling to advance the $50,000, so the matter went no further.

Around the same time, Mr. Young decided to reach out to Legalist, a well-known national litigation funding company, to see if it was willing to fund expenses in the case. After reviewing documents filed in the Delaware Bankruptcy and the related adversary proceeding, Legalist declined to provide funding for either expenses or fees at that time. Legalist left open the possibility that it might fund expenses (but not fees) in the future but did not want to commit to doing so in December 2019 due to the complexity and risk of the claims litigation and the adversary proceeding litigation in Delaware.

Once Dilworth Paxson was employed, and Thompson Burton was converted to a contingency arrangement, Peter Hughes and Mr. Young immediately began working on a response to the objection to Trustee Lemeh's claim and on a motion to stay all claims litigation pending the resolution of the adversary proceeding. At that time, in December 2019, Mr. Young was overwhelmed with another case that had a looming deadline (since the claim objection was filed the

10

Exhibit 1 to Thompson Burton's Answer to Pioneer's Interrogatories Nos. 1-11
Case 3:09-bk-03570   Doc 309-14   Filed 11/10/21   Entered 11/10/21 13:07:12   Desc
Exhibit L - Timeline   Page 11 of 24

day before Thanksgiving, with no warning, Mr. Young had no ability to prepare his calendar for the work that would be required by this matter). Peter Hughes and Mr. Young agreed that, for those pleadings, Dilworth Paxson would take the lead on drafting. Mr. Young expressed at that time that Thompson Burton would likely want to take the lead on future documents, because Trustee Lemeh asked Mr. Young to serve as lead counsel.

(17) (1/09/2020) DE 169, 173, 174 filed in the Delaware Bankruptcy: Dilworth Paxson drafted a response to the Delaware Defendants' claim objection and a separate Motion to Stay Proceedings. Mr. Young reviewed several drafts of both pleadings, as did Trustee Lemeh, and Mr. Young offered comments and revisions. By late January into early February, Mr. Young's litigation calendar had improved and Mr. Young was more involved in the final drafts of the pleadings and in preparing for the hearings.

(18) (2/25/2020): Mr. Young flew to Delaware to join attorneys from Dilworth for a hearing on February 25, 2020. The hearing was to consider, among other motions, the Delaware Defendants' objection to Trustee Lemeh's claim and Trustee Lemeh's Motion to Stay all Proceedings pending the resolution of the Adversary Proceeding. The Dilworth Paxson attorneys, the Delaware Trustee's counsel and Mr. Young all understood how critical these motions were to the ultimate success of this case. If the Court were to disallow Trustee Lemeh's claim (as well as MPT's $14 million of claims in the DSI Parent case) then other than Trustee Lemeh's claim and MPT's claims, there were only approximately $3 million in claims in the Delaware Bankruptcy, and there would remain only about $3 million in valid claims against DSI Parent, and the Delaware Defendants would simply pay those claims off and escape any further liability. Even if the Court were to decide that claims litigation and related discovery could proceed before the conclusion of the Adversary Proceeding, all parties knew that the Delaware Defendants would attempt to inundate Trustee Lemeh and her counsel with discovery and pretrial jockeying, since the Delaware Defendants were represented by some of the largest, most well-respected law firms in the country.

(19) (2/25/2020) DE 188 filed in the Delaware Bankruptcy: the Court ruled that all claim objections and related litigation would be stayed pending the resolution of the Adversary Proceeding. While this did not signal an end to the litigation by any means, it certainly meant that the claims litigation would be paused for some period of time while the issues in the Adversary Proceeding were decided.

(20) (2020 Summer): the global pandemic brought all cases, including the Delaware Bankruptcy, to a screeching halt. No motions were decided for quite some time. Eventually, as 2020 wore on, the Delaware Bankruptcy court began issuing rulings on certain motions for summary judgment that had been pending before it. The orders on these motions for summary judgment brought the issues to be decided in the Adversary Proceeding, and the potential liability associated therewith, into more clear view. Some of the rulings on motions for summary judgment were favorable to Trustee Lemeh's position; others were very unfavorable. For example, one of the most unfavorable decisions was the Court's decision that the damages in the Adversary Proceeding were capped by the total amount of claims. The Delaware Trustee had asked that the Court allow him to pursue damages of $600 million, even though claims were less than $300 million. This decision made the Trustee Lemeh's $150 million claim even more important to the

ultimate success of the Adversary Proceeding. In fact, after that ruling, Mr. Coren contacted Mr. Young to tell Mr. Young that the Delaware Trustee suspected that the Delaware Defendants might try to purchase Trustee Lemeh's claim, and to ask Trustee Lemeh to hold steady to Trustee Lemeh's claimed amount.

(21)    (Late 2020 – Early 2021): Mr. Young continued following the rulings issued by the Delaware bankruptcy court throughout 2020 and early 2021. All the while Adam Stein-Sapir, whom Mr. Young had met in person in Delaware on February 25, 2020, periodically called or emailed Mr. Young to get his assessment of the case, its future, and timelines. Mr. Stein-Sapir would also frequently offer his advice about how different issues in the case should be handled or pursued, which Mr. Young would pass along to Trustee Lemeh for her information.

(22)    (3/2021): In March 2021, Mr. Young learned that Mr. Coren (counsel for the Delaware Trustee) and the Delaware Defendants were going to attempt to mediate the case once again. Mr. Coren seemed conflicted about whether the mediation had any likelihood of success. On one hand, Mr. Coren told Mr. Young that the parties had been very far apart at the last mediation that they attempted. On the other hand, Mr. Coren believed that the orders issued by the Court on the various motions for summary judgment had narrowed some of the issues. Over forty lawyers had blocked out three days on their calendars for this mediation, so there was some reason for optimism. The Delaware Trustee and Ms. Lemeh decided not to divulge to any of the creditors that the mediation was occurring, for fear that they might meddle in the outcome (especially Pioneer).Mr. Young offered to attend the mediation. Mr. Coren said that would not be necessary, but asked Mr. Young to put the dates on Mr. Young's calendar so that Mr. Coren could call Mr. Young with any questions or requests, since Trustee Lemeh was by far the largest creditor of the DSI Parent.

(23)    (4/7/2021 – Summer 2021): The mediation began on April 6, 2021. On the second day of mediation, April 7, 2021, Mr. Coren telephoned Mr. Young around midnight. Mr. Young answered his call because Mr. Young had promised to make himself available during the mediation. Mr. Coren informed Mr. Young that the parties were very close to a mediated settlement but that one of the terms of the potential settlement was that Trustee Lemeh would have to grant the Delaware Defendants a release. He and Mr. Young discussed that concept, including whether Trustee Lemeh would have to seek permission from the Tennessee bankruptcy court to grant such a release. Ultimately, Mr. Young determined that relief from Court would not be necessary since the Bucks County estate had no direct cause of action against the Defendants (thus the Trustee would essentially be releasing a claim for nothing), and Mr. Young informed Mr. Coren that Mr. Young would recommend that Trustee Lemeh grant a release. Mr. Coren did not inform Mr. Young of any other terms of the potential settlement at that time, nor did Mr. Young inquire since Mr. Young understood the mediation was ongoing and was likely subject to a confidentiality provision.

The next day, April 8, 2021, Mr. Coren telephoned again to inform Mr. Young that the parties had reached an agreement in principle to settle the Adversary Proceeding for $52.5 million. Mr. Young informed Trustee Lemeh of this development. Trustee Lemeh was not overly thrilled with the result, as she was hoping that her estate would receive a 100% distribution on account of its $150 million claim (and the $52.5 million outcome would almost assuredly mean that

Exhibit 1 to Thompson Burton's Answer to Pioneer's Interrogatories Nos. 1-11
Case 3:09-bk-03570   Doc 309-14   Filed 11/10/21   Entered 11/10/21 13:07:12   Desc
Exhibit L - Timeline   Page 13 of 24

the Bucks County distribution was $30 million or less). Trustee Lemeh was less involved in the minutia of the Delaware Bankruptcy litigation and was less familiar with the potential pitfalls for the Bucks County estate's position. To the contrary, Mr. Young felt that it was a very favorable outcome given the risk for a much smaller judgment, the time and expense of future litigation and appeals, and the risk that the Delaware Defendants would successfully reduce the Bucks County claim. The $150 million claim figure included interest and fees (which would not be recoverable unless the DSI Parent case made a 100% distribution), a claim by DSI Holding of approximately $15 million (which was likely to be be disallowed or withdrawn), and a $75 million claim by MPT (which was likely grossly overstated, though it was unknown how much of its claim was valid).

Mr. Young informed both MPT and Pioneer of the settlement as soon as Mr. Young was allowed to divulge its terms. Both creditors were very happy about the outcome. Pioneer immediately began asking whether its claim would be paid in full, and how quickly Mr. Young thought a distribution might be made. Mr. Young told Mr. Stein-Sapir that Mr. Young was not yet sure about the timing, but that the distribution amount would be totally dependent upon the allowance/disallowance of MPT's claim, about which Mr. Young had no knowledge at that point. Mr. Young walked through the math with Mr. Stein-Sapir, explaining that a distribution was likely to be $30,000,000 or less, that counsel would be entitled to 1/3 of that amount, and that the Trustee would be entitled to a commission of approximately $1 million. That would leave something less than $19,000,000 for distribution on account of what was on paper $100,000,000 in claims. Mr. Stein-Sapir repeatedly informed Mr. Young that he thought MPT was entitled to no claim and that his claim should be allowed in full. Mr. Stein-Sapir even asked, on multiple occasions, whether his claim would be paid interest if there were excess proceeds. While Mr. Young always answered his distribution questions, Mr. Young repeatedly informed him that Mr. Young saw no valid theory to completely invalidate MPT's claim; that Mr. Young believed the issue would be the amount of their claim, not the allowance thereof.

Over the next few weeks after the settlement was reached, Mr. Young reviewed, revised, and ultimately asked Trustee Lemeh to execute a release and settlement agreement with the Delaware Defendants on behalf of the Bucks County estate. While this was essentially the end of the litigation for the Delaware special litigation counsel (and, indeed, they quickly filed a fee application for approximately $20 million), there was much more work to do still to move funds from the Delaware Bankruptcy into the Bucks County bankruptcy.

Trustee Lemeh tasked Mr. Young with attempting to work out the resolution of the Bucks County claim with the Delaware Trustee, positioning the Bucks County claim as positively as possible with respect to the other Delaware claims, ensuring a speedy distribution, and doing so as efficiently as possible. This was a very difficult task that required significant ingenuity and negotiating skill.

13

There were a multitude of potential issues with carrying out this directive. The most glaring issue was that, in addition to its $75 million claim in the Bucks County case, MPT had $14 million of claims in the DSI Parent case. Other than Trustee Lemeh's claim and MPT's claims, there were only approximately $3 million in claims in the Delaware Bankruptcy. Therefore, in order to maximize the return to the Bucks County estate, it was important to convince MPT to withdraw its Delaware claims. If MPT's claims were allowed on par with Trustee Lemeh's claim, and certainly if it were allowed ahead of her claim (for which there was some legal argument), it would significantly reduce the distribution to the Bucks County estate.

Mr. Young had dozens of calls and emails with MPT's counsel in an effort to convince them to withdraw their Delaware Bankruptcy claims. Mr. Young had emphasized two primary points to convince MPT to withdraw its Delaware claims. First, Mr. Young explained to them that, if they were to pursue their Delaware claims, they would likely face months, or years, of claims litigation in Delaware. Mr. Young felt certain that the Delaware Trustee would object to MPT's claims because MPT had entered into a settlement agreement with DSI Parent concerning DSI Parent's liability on MPT's rent. Moreover, it was probable that Trustee Lemeh, as a creditor of DSI Parent, would also file an objection to MPT's Delaware Bankruptcy claims and then, in turn, to its Tennessee claims on the grounds that they were duplicative of the Delaware Bankruptcy claims. Mr. Young told MPT's counsel that the time and cost of such litigation would be significant, and that their Delaware Bankruptcy claims had more legal problems than did their Tennessee claims. While the settlement with DSI Parent might prove to be a significant factor in Delaware, Mr. Young did not think it legally impacted the Tennessee claims.

Further, Mr. Young set about to show MPT's counsel that, under almost any scenario, MPT's distribution on account of its Tennessee claims would be equal to or greater than its distribution on account of its Delaware claims. Mr. Young prepared several spreadsheets showing various scenarios for how MPT's claims might be treated in Delaware versus how they might be treated in Tennessee. Under every scenario, including a scenario in which all Tennessee claims were paid in full and MPT's Tennessee claim only received the remaining funds as a hypothetically subordinate claim, Mr. Young showed that MPT was better off accepting a distribution in Tennessee.

After hours of calls, emails, and calculations, MPT ultimately agreed to withdraw its Delaware claims and to revise its Tennessee claims downward. MPT sent Trustee Lemeh a proposed amended claim of approximately $27 million, with some backup to support that number. Trustee Lemeh agreed with MPT that there seemed to be legal basis for the $27 million claim, though she reserved final opinion on the revised claim for when it was actually filed and she had funds to distribute (as Trustee Lemeh never does a final review of claims until she has funds on hand to distribute).

Another issue was the priority of Trustee Lemeh's claim versus the other $3 million in Delaware claims. While the Trustee was aware of the DSI Parent's bankruptcy prior to the expiration of the claims deadline, she did not file a claim until it became apparent that DSI Parent and its shareholders (the Delaware Defendants) had defrauded Bucks County and its creditors. Therefore, Trustee Lemeh's claim was filed later in time than the other $3 million in claims. It was anticipated that the Delaware Trustee might object to the Bucks County claim on the grounds that it was late-filed. Considering that all other claims in Delaware accounted for less than 10% of the amount to be distributed by the DSI Parent's estate, Trustee Lemeh made the business decision to offer to subordinate her claim to the other claims. Trustee Lemeh determined that the time that would be saved by this concession (at least one year) would more than compensate for the $3 million subordination, considering lost interest, increased legal fees of both estates, and other administrative fees (such as bank fees) that would be incurred by both estates while claims objections were pending.

Mr. Young discussed this potential resolution on several occasions with Mr. Stein-Sapir. While Pioneer now criticizes Trustee Lemeh's decision to subordinate the Bucks County claim to the other $3 million in claims, at the time, Mr. Stein-Sapir expressed that he thought it was a great idea and repeatedly urged Mr. Young to try to negotiate that concession in order to conserve time and administrative expenses; Mr. Stein-Sapir was especially concerned about the fees that might be spent by the Delaware Trustee in filing multiple, legally-complicated claims objections. Any fees incurred by the Delaware Trustee would reduce the distribution to the Bucks County estate, dollar for dollar, and the Delaware Trustee's counsel was expensive by Tennessee standards, employing typical "Delaware rates".

The other issue that presented a potential problem in accomplishing Trustee Lemeh's goals to maximize the estate's recovery as efficiently as possible was the length of time that it takes to have a Trustee's Final Report approved in Delaware. While the United States Trustee in Nashville approves Trustees' Final Reports in less than sixty days, it is not uncommon for the United States Trustee in Delaware to take 18-24 months to approve Trustees' Final Reports. If Trustee Lemeh waited for the Delaware Trustee to make a standard distribution, the creditors of the Bucks County estate would not likely see the funds until 2023.

Trustee Lemeh and Mr. Young scheduled a call with the Delaware Trustee and his counsel, Mr. Menkowitz, to discuss possible resolutions to all of these issues. In that call, Trustee Lemeh and Mr. Young informed the Delaware Trustee that Trustee Lemeh had an agreement in principle with MPT by which MPT would be withdrawing its Delaware claims. Both the Delaware Trustee and his counsel seemed very surprised that Mr. Young was able to get MPT's consent on this point; Mr. Menkowitz asked how Mr. Young was able to convince MPT to withdraw its Delaware claims. Trustee Lemeh, on advice from Mr. Young, then offered to subordinate the Bucks County claims to the other $3 million in claims, allowing them to be paid 100% distributions, but only on the condition that the Delaware

15

Exhibit 1 to Thompson Burton's Answer to Pioneer's Interrogatories Nos. 1-11
Case 3:09-bk-03570   Doc 309-14   Filed 11/10/21   Entered 11/10/21 13:07:12   Desc
Exhibit L - Timeline   Page 16 of 24

Trustee was able to make a partial distribution within sixty days of all funds in the Delaware Bankruptcy estate except for a $200,000 - $300,000 holdback. All parties strategized about ways that this might be accomplished. Ultimately, it was agreed that, if MPT withdrew its Delaware claims, the Delaware Trustee would pay the $3 million in other claims in full, and would immediately distribute the remainder, minus a $300,000 holdback for incidental administrative costs, to Trustee Lemeh.

Mr. Young immediately informed both MPT and Pioneer of this potential resolution. Not only did both creditors consent and support the proposed resolution, Pioneer was thrilled that, under this plan, a distribution could be realized as early as December 2021. Mr. Stein-Sapir praised the work that Mr. Young did and said that the outcome was "fantastic." Mr. Stein-Sapir told Mr. Young that this was going to be his company's biggest net recovery to date and said that he and Mr. Young needed to find other deals on which to work together.

Mr. Young had several conversations with Mr. Stein-Sapir between the time that an agreement in principle with the Delaware Trustee was reached and the filing of Pioneer's objections to the fees of the Trustee's professionals. Most of those calls involved the mechanics and timing of distributions. In several of those calls, Mr. Stein-Sapir revisited the allowance or disallowance of MPT's claims. Mr. Young reiterated that Mr. Young believed that MPT would have an allowed claim and that the only question was the amount of the claim. After Mr. Young had seen an advance copy of MPT's claim, Mr. Young told him that Trustee Lemeh was unlikely to oppose MPT's claim though she would not make a final decision on that until she had funds on hand to distribute. Mr. Young reminded Mr. Stein-Sapir that, regardless of Trustee Lemeh's position, Pioneer could object to MPT's claim if it saw fit. At one point, Mr. Stein-Sapir expressed that he really wanted Trustee Lemeh to object to MPT's claim because he felt that Trustee Lemeh's opinion would carry more weight with the Court.

At no point during the multitude of calls that Mr. Young had with Mr. Stein-Sapir did Mr. Stein-Sapir criticize the work that had been performed by counsel or question the contingency fee. The closest Mr. Stein-Sapir got to questioning fees is that he once asked how the contingency fee would be split among Thompson Burton and Dilworth Paxson. Mr. Young told him that this issue was still being discussed, and that there had arisen a minor dispute about that issue because Dilworth Paxson believed they were entitled to more than 50% of the contingency fee. Mr. Young recalls that Mr. Stein-Sapir opined that he felt that Thompson Burton had done more work to deserve a greater percentage of the fee and that he might consider objecting to Dilworth Paxson's fees if they sought more than 50%.

The only other time that the contingency fee was ever a topic of conversation was a week or so before the deadline for objecting to the fee application. Mr. Stein-Sapir asked if Mr. Young had discussed the fee applications with the United States Trustee's office. Mr. Young told him that Mr. Young had (because Mr. Young had multiple conversations with both Assistant U.S. Trustee, Megan Seliber, and Trial Attorney, Tim Niarhos, prior to and subsequent to filing

16

the fee applications), and that it was Mr. Young's understanding that the United States Trustee supported both firms' fee applications. Mr. Stein-Sapir again brought up the issue about the allowance of MPT's claim; Mr. Young reiterated that Trustee Lemeh would likely not file an objection to any claims in the case. At that point Mr. Stein-Sapir made a statement to the effect of "It seems unfair that the estate is going to get a $27 million distribution and my claim is only going to receive $4.5 million on a $10.5 million claim." Mr. Young took that to be a subtle, passive-aggressive threat meant to coerce Mr. Young into convincing Trustee Lemeh to object to the MPT claim in order to avoid an objection to fees. Of course, taking such a position would be ethically prohibited and would violate Mr. Young's fiduciary duty to Trustee Lemeh and the other creditors of the estate, so the comment had no effect on Mr. Young's advice to the Trustee.

(24)     DE 253 (7/27/2021): Thompson Burton and Dilworth Paxson file a Motion for Allowance of Compensation.

(25)     DE 257 (8/17/2021): Pioneer files Objection to Thompson Burton and Dilworth Paxson's Motion for Allowance of Compensation.

(26)     DE 259 (8/18/2021): Pioneer files Opposition to Motion to Conduct Hearing via Zoom.

## (b)  *In Re DSI Renal Holdings LLC., 11-11722-KBO (Bankr. Del.) (the Delaware Bankruptcy)*

### (I)     CLAIMS:

(1)     Claim 15-1 (5/31/2013): Claim filed by MPT of Bucks County, L.P. for $10,400,787.98. Basis of claim stems from MPT of Bucks County, L.P. v. DSI Holding Company, Inc., DSI Facility Development, LLC, Centre Bregal Partners, L.P., Jerome S. Tannenbaum, and M. Stephen Harrison, C.A. No. N09C-11-160 CL. in the Superior Court of Delaware on Nov. 19, 2009. Basis of Complaint was that the defendants fraudulently induced the plaintiff to release a guaranty in favor of a new guaranty by DSI Holding Company, Inc. and to induce plaintiff into increasing its funding for construction of hospital in Bucks County, Pennsylvania. On September 13, 2010, MPT of Bucks County, L.P. stipulated to entry of an Order of Judgment in the Superior Court against DSI Holding Company, Inc. and DSI Renal, Inc. In connection with execution of the judgment, defendants were alleged to have materially misrepresented DSI Renal, Inc's net worth and its ability to satisfy the judgment to induce MPT of Bucks County, L.P. into entering into a reduced Settlement Agreement.

(2)     Claim 16-1 (8/22/2013): Claim filed by Trustee Lemeh, Trustee for Bucks County for $108,618,908.47. Basis of claim was that DSI Parent was jointly and severally liable on all debts owed to the Bucks County creditors.

(3)     Claim 16-2 (10/11/2013): Claim filed by Trustee Lemeh, Trustee for Bucks County for $151,822,439.82. Basis of claim was that DSI Parent was liable to Bucks County jointly and severally upon all debts owed to Bucks County creditors.

Exhibit 1 to Thompson Burton's Answer to Pioneer's Interrogatories Nos. 1-11
Case 3:09-bk-03570   Doc 309-14   Filed 11/10/21   Entered 11/10/21 13:07:12   Desc
Exhibit L - Timeline   Page 18 of 24

(4) Claim 16-3 (1/24/20): Claim filed by Trustee Lemeh, as trustee for Bucks County for $291,924,539.41. Basis of claim was an amendment to reflect all Bucks County claims. Theory of claim was that DSI Renal Holdings, LLC was liable on all debts owed to the creditors of Bucks County under an alter ego and/or veil piercing theory or fraud.

(5) Claim 16-4 (8/11/21): Claim filed by Trustee Lemeh for $87,539,073, Trustee.

## (II) KEY DOCKET ENTRIES

(1) DE 143 (11/27/2019): Healthclaim filed objection to Claim No. 15-1. Basis of objection was that MPT released its claims in a pre-petition settlement agreement. MPT was landlord of Bucks County Oncoplastic Institute, LLC. Briefing was completed by Morris Nichols, Potter, Milbank, Friedman, Schiff, Paul Weiss, and Berluti as counsel for Healthclaim.

(2) DE 146 (11/27/2019): Healthclaim filed objection to Claim 16-2. Basis of objection was that Claim 16-2 was filed too late, Trustee Lemeh lacked standing because DSI Parent was not liable for *all* of the debts of Bucks County, and there was no basis to disregard Bucks County's separate corporate existence and veil pierce. Briefing was completed by Morris Nichols, Potter, Milbank, Friedman, Schiff, Paul Weiss, and Berluti as counsel for Healthclaim.

(3) DE 169 (1/09/2020): Trustee Lemeh, Bucks County Trustee filed a Motion to Continue Claims Objection of Healthclaim Recovery LLC to Claim 16. The motion asked the court to determine whether it was appropriate to address or determine claims objections at that time. The motion asked the Court to continue the objections process until after the related fraudulent conveyance adversary proceeding was adjudicated. Brief was filed by Dilworth Paxson and Thompson Burton.

(4) DE 173 (1/30/2020): Healthclaim filed an Omnibus Objection to Motions to Continue or Stay Objections to Proofs of Claim 15-1 and 16-2. Issues briefed including the judicial economy of resolving objections to claims in advance of adjudicating the adversary proceeding, standing of defendants to object to the claims, and whether the Delaware Trustee has exclusive authority to object to claims. Briefing was filed by Morris Nichols, Potter, Milbank, Friedman, Schiff, Berluti, and Paul Weiss.

(5) DE 174 (2/13/2020): Trustee Lemeh on behalf of Bucks County filed a Reply Brief in Support of her previous Motion to Continue Claims Objection of Healthclaim. Issues briefed included emphasizing key aspects of the related adversary proceeding indicating wrongdoing by defendants, that Claim 16 had asserted a valid claim for alter ego, veil piercing, and fraud, support of Trustee Lemeh's right to file an amended claim, issues related to reverse bifurcation, overlap of issues with the related adversary proceeding, whether additional discovery was needed before determining objections to Claim 16, and whether it was appropriate for the defendants to lead the process of objecting to claims. Briefing was filed by Dilworth Paxson and Thompson Burton.

Exhibit 1 to Thompson Burton's Answer to Pioneer's Interrogatories Nos. 1-11
Case 3:09-bk-03570   Doc 309-14   Filed 11/10/21   Entered 11/10/21 13:07:12   Desc
Exhibit L - Timeline   Page 19 of 24

(6)     DE 188 (2/25/2020): the Court granted the motion to stay the objections to proofs of claim indefinitely until further order from the Court.

(7)     DE 220 (7/23/2021): Delaware Trustee and Trustee Lemeh file a Stipulation with the Court explaining the following: The Delaware Trustee had generated $52,520,918.62 for the Delaware estate.  There were $20,012,122.55 of administrative expenses, leaving $32,508,796.07 in the Delaware estate.  Trustee Lemeh had filed Claim No. 16-2 asserting a general unsecured claim of $291,924,539.41.  MPT had filed a general unsecured claim of $10,400,787.98 in the 11-11722-KBO case as well as Proof of Claim No. 2 in DSI Facility bankruptcy for $4,580,071.41.  With the exclusion of the Trustee Lemeh and MPT claims, the remaining creditors hold claims in total maximum amount of $3,373,857.32 ("Remaining Claims").  The Delaware Trustee intends to file objections to certain Remaining Claims.  DSI Hospitals had filed Proof of Claim No. 50 in the Bucks County bankruptcy. To settle Trustee Lemeh's claim and the DSI Hospital claim, the parties had entered into a settlement.  Within seven days of the stipulation, Trustee Lemeh would amend the Bucks County claim filed in Delaware to reduce the claim to $87,539,073.00.  The Delaware Trustee would then withdraw the DSI Hospital Proof of Claim from the Bucks County bankruptcy in Tennessee.  The Delaware Trustee would make a distribution to Remaining Creditors, paying them in full, with a $300,000 holdback.  Then, the Delaware Trustee would distribute all remaining proceeds to the Bucks County estate, constituting full satisfaction of the Claim No. 16.  The stipulation was agreed to by Thompson Burton and Fox Rothschild (attorneys for the Delaware Trustee).

## (c)    *Adversary Proceeding | Alfred T. Giuliano, Chapter 7 Trustee v. Michael Schnabel | Case Number 14-50356-KBO (part of 11-1172(KG) bankruptcy case)* **(The Adversary Proceeding)**

### (I)    KEY DOCKET ENTRIES

(1)     DE 56 (7/20/2017) 574 B.R. 446 (Bankr. D. Del.): Bankruptcy Court issued order granting in part, denying in part, and deferring in part certain motions to dismiss.  Thrust of decision was that fraudulent transfer claims survived motion to dismiss.

(2)     (8/15/2018) Deposition taken of Phillip Young.

(3)     DE 177 (4/30/2019): Northwestern Mutual's Motion for Summary Judgment.  Motion sought dismissal of aiding and abetting breach of fiduciary duty claim.

(4)     (2/4/2020) 2020 WL 550987 (Bankr. D. Del.), Bankruptcy Court granted in part and denied in part certain motions for summary judgment.  Specifically, in what was referred to as the "Capping Motion," the Court held that the Delaware Trustee could not recover damages from defendants in excess of claims filed in the DSI Parent bankruptcy *as to the fraudulent transfer* claims, while other claims remained viable.

(5)	DE 258 (3/30/2020) 617 B.R. 496 (Bankr. D. Del.), Bankruptcy Court granted motions for partial summary judgment holding that Delaware Trustee could not recover value of CDSI I stock attributable to contributions of the defendants and/or non-stock proceeds and also limited ability of Delaware Trustee to recover amounts paid to defendants from a subsequent acquisition of DSI Renal.  The court also limited the Delaware Trustee's ability to recover on certain fraudulent transfer claims.  Ultimately, the Court's opinion left open multiple categories of damages that the Delaware Trustee could still hope to recover.

(6)	(12/2/2020) 2020 WL 7054390 (Bankr. D. Del.), Bankruptcy Court granted in part and denied in part certain motions for summary judgment.

STATE OF _Tennessee_ )
COUNTY OF _Williamson_ )


I, Phillip G. Young, after being duly sworn according to law, make oath that I am a partner of Thompson Burton PLLC, and in this capacity I execute this Response to Pioneer's Interrogatories ("Response"). The information in this Response is not necessarily personally known to me and may have been obtained from investigations by counsel and other persons whom I believe to be reliable and capable of ascertaining the facts stated in said Response. On the basis of these investigations, and to the best of my knowledge, information, and belief, the matters set forth in the Response are true and correct.

_____
Affiant


SWORN TO AND SUBSCRIBED before me on this the _20_ day of September, 2021.

_____
Notary Public


My commission expires: _11.5.24_

BRITTANY WOOD
STATE OF TENNESSEE
NOTARY PUBLIC
WILLIAMSON COUNTY
My Commission Expires 11-05-2024

These Discovery Responses are dated September 20, 2021.

Respectfully submitted,

/s/ Michael G. Abelow
Michael G. Abelow (No. 26710)
Robert J. Mendes (No. 17120)
Will D. Pugh (No. 37616)
SHERRARD ROE VOIGT & HARBISON,
PLC
150 3rd Ave. South, Suite 1100
Nashville TN 37201
(615) 742-4532
mabelow@srvhlaw.com
bmendes@srvhlaw.com
wpugh@srvhlaw.com

Counsel for THOMPSON BURTON
PLLC and DILWORTH PAXSON LLP

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2021, I served a copy of the foregoing by email on:

Shane G. Ramsey
NELSON, MULLINS, RILEY & SCARBOROUGH LLP
150 Fourth Avenue North, Suite 1100
Nashville TN 37219
(615) 664-5355
shane.ramsey@nelsonmullins.com

*Counsel for Pioneer Funding Group, LLC*

Megan Seliber
Office of the U.S. Trustee, Trial Attorney
318 Customs House, 701 Broadway
Nashville, TN 37203
(615) 695-4060
Megan.Seliber@usdoj.gov

*/s/ Michael G. Abelow*
Michael G. Abelow